[No. G045390. Fourth Dist., Div. Three. Oct. 24, 2012.]

THE PEOPLE ex rel. MICHAEL STRATHMANN, Plaintiff and Appellant,
v.
ACACIA RESEARCH CORPORATION et al., Defendants and Respondents.

## COUNSEL

Buchalter Nemer, Robert M. Dato; Kelley, Donion, Gill, Huck & Goldfarb, Kelley, Goldfarb, Gill, Huck & Roth and Michael A. Goldfarb for Plaintiff and Appellant.

Corbett, Steelman & Specter, Richard B. Specter and Diane L. Ellis for Defendants and Respondents.

## OPINION

**FYBEL, J.—**

### INTRODUCTION

The anti-SLAPP statute,[1] Code of Civil Procedure section 425.16 (section 425.16), authorizes a special motion to strike "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) Code of Civil Procedure section 425.17, subdivision (b) (section 425.17(b)) creates an exception to the anti-SLAPP statute for any action "brought solely in the public interest or on behalf of the general public" if three conditions set forth in the statute are met. Such a public interest lawsuit is not subject to a special motion to strike under section 425.16.

A qui tam action[2] is one brought under a statute that allows a private person to sue as a private attorney general to recover damages or penalties,

---

[1] SLAPP stands for strategic lawsuit against public participation. (*Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858, 862, fn. 1 [90 Cal.Rptr.3d 205].)

[2] " 'Qui tam' is part of the longer Latin phrase 'qui tam pro domino rege quam pro se ipso in hac parte sequitur,' which means 'who brings the action for the king as well as for himself.' [Citation.]" (*U.S. ex rel. LaCorte v. SmithKline Beecham* (3d Cir. 1998) 149 F.3d 227, 230, fn. 1, italics omitted.)

all or part of which will be paid to the government. (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538 [132 Cal.Rptr.2d 165] (*Weitzman*).) Under California law, a qui tam action is brought on behalf of the People of the State of California, and the People are " '[t]he real party in interest.' " (*Ibid.*; see *U.S. ex rel. Killingsworth v. Northrop Corp.* (9th Cir. 1994) 25 F.3d 715, 720.)

■ In this case, we conclude the qui tam action brought by Michael Strathmann as relator "on behalf of the general public" under Insurance Code section 1871.7 falls within the public interest exception of section 425.17(b). The trial court erred by finding otherwise and should have denied the special motion to strike brought by defendants Acacia Research Corporation (Acacia), CombiMatrix Corporation (CombiMatrix), and Amit Kumar (collectively, Defendants). We therefore reverse the order granting Defendants' special motion to strike, reverse the order and judgment awarding Defendants attorney fees and costs, and remand.

### ALLEGATIONS OF THE COMPLAINT

Strathmann's qui tam complaint against Acacia, CombiMatrix, and Kumar alleged the following facts.

### I.

### Theft of Technology Developed at Nanogen, Inc.

Acacia, a publicly owned Delaware corporation, formed CombiMatrix in 1995 as a subsidiary. In 2007, CombiMatrix separated from Acacia and became a publicly traded company. Kumar joined Acacia as a vice-president in 2000 and the next year became the chief executive officer of CombiMatrix, a position he held until the end of June 2010.

In 1994, Dr. Donald Montgomery went to work for Nanogen, Inc. (Nanogen), a biotechnology company in San Diego. Montgomery signed an agreement with Nanogen, which provided that any invention conceived by Montgomery while at Nanogen belonged to it. While employed by Nanogen, Montgomery invented a unique biotechnology process by which chemical compounds were made on an array of electrodes. Montgomery disclosed his new invention to Brooke Anderson, one of Acacia's founders, and conspired with Acacia to start a biotechnology company based upon the new invention. Acacia made at least one payment to Montgomery while he was employed by Nanogen.

Montgomery resigned from Nanogen in August 1995. In October 1995, he and Acacia founded a new company, CombiMatrix, to commercially exploit

this "stolen technology." Montgomery continued to receive additional payments from Acacia through Anderson.

In November 1995, Montgomery sued Nanogen over rights to the technology he developed at Nanogen. In February 1996, Nanogen and Montgomery settled the lawsuit.

In April 1996, Montgomery became a director of CombiMatrix and received shares of its stock. In July 1996, he filed a provisional patent application covering CombiMatrix's core technology. This patent application was based upon the invention that Montgomery had conceived while at Nanogen.

## II.

### Nanogen's Lawsuit Against CombiMatrix and Montgomery

In November 2000, Nanogen filed a lawsuit alleging CombiMatrix and Montgomery had stolen technology owned by Nanogen. In December 2000, Acacia and CombiMatrix notified National Union Fire Insurance Company of Pittsburgh, Pennsylvania (National Union), of the Nanogen lawsuit, and made a claim under Acacia's directors, officers and corporate liability policy (the Policy) issued by National Union. The Policy required National Union to reimburse certain defense costs over a self-insured retention. National Union acknowledged receipt of the claim and sent a letter to CombiMatrix, addressing policy issues and requesting more information.

When Nanogen filed its lawsuit, CombiMatrix was in the early stages of negotiating a transaction to customize and license its technology to Roche Applied Science (Roche). Roche was concerned about the Nanogen lawsuit and throughout 2001 expressed concern whether CombiMatrix had clear title to the technology.

In April and September 2001, CombiMatrix requested that National Union reimburse legal expenses incurred in the Nanogen lawsuit. National Union did not respond in writing to either request.

Several weeks into the litigation, CombiMatrix began to look for ways to settle with Nanogen. CombiMatrix wanted to settle the lawsuit because Montgomery had stolen the technology from Nanogen, its lawsuit was an impediment to CombiMatrix going public, and Roche wanted CombiMatrix to secure clear title to the technology before providing it with additional funding. CombiMatrix's efforts to settle the Nanogen lawsuit were not related

to any alleged failure of National Union to reimburse legal expenses, and CombiMatrix's March 2002 revised financial forecast made no mention of any cash shortage caused by that lawsuit.

Roche required the effective date of its agreement with CombiMatrix be the date that CombiMatrix settled the Nanogen litigation. A draft partnership document required that CombiMatrix obtain a settlement with Nanogen, by which Nanogen would confirm CombiMatrix's sole ownership of some disputed patents.

In July 2002, while preparing for production of documents to Nanogen, CombiMatrix's attorneys discovered the check written by Acacia to Montgomery while he was employed by Nanogen. Kumar later described this check as a "smoking gun."

## III.

### Settlement of the Nanogen Lawsuit

On August 8, 2002, CombiMatrix reached agreement in principle to settle with Nanogen. As of that date, CombiMatrix had not communicated with National Union for over a year. A new claims representative at National Union sent a letter to CombiMatrix, asking about the status of the Nanogen lawsuit. CombiMatrix did not respond.

On September 30, 2002, CombiMatrix entered into a final written settlement agreement with Nanogen. CombiMatrix agreed to pay Nanogen cash, stock, and future royalties with a total value of $20.1 million. On the same day, Kumar informed Roche executives that the Nanogen lawsuit had been settled and the condition to the Roche agreement was satisfied.

In late 2002, Strathmann, who was then an employee of CombiMatrix, asked Kumar why the Nanogen lawsuit had been settled for such a large percentage of CombiMatrix stock. Kumar replied that Montgomery had stolen the technology from Nanogen; a "smoking gun" document had been discovered by the lawyers; and if the case did not settle, CombiMatrix would have had to turn the document over to Nanogen. Kumar said the document was a check written by Acacia to Montgomery while he was still employed at Nanogen, and that it proved that Acacia and Montgomery had been working together before Montgomery left Nanogen. Kumar also told Strathmann the reason for the settlement was to satisfy Roche.

## IV.

### Defendants' Claims Made to National Union

In November 2002, Defendants made a claim with National Union for reimbursement of $1.8 million in litigation expenses, a right to reimbursement for the full cost of the settlement of the Nanogen lawsuit, and costs and attorney fees. The claim was fraudulent because Defendants knew (1) the technology at issue in the Nanogen lawsuit was stolen from Nanogen in 1995, (2) the Policy's provisions and exclusions did not provide coverage for a lawsuit based on a claim of stolen technology, and (3) the Policy's provisions and exclusions did not provide coverage until Montgomery became a director in April 1996.

Defendants falsely represented to National Union that the reason CombiMatrix and Montgomery had settled with Nanogen was because National Union had not reimbursed their legal bills and that, as a result, they were unable to continue to defend the Nanogen claims. Defendants failed to disclose to National Union that CombiMatrix internal documents projected more than $12 million cash on hand at the time of the settlement and that CombiMatrix had additional resources available to it from its parent company, Acacia.

## V.

### The Bad Faith Lawsuit Against National Union

In April 2005, Acacia and CombiMatrix filed a complaint against National Union for breach of contract and bad faith (the bad faith lawsuit), alleging, "[i]n or around September, 2002, following abandonment by Defendants, mounting legal fees, and the possibility that Plaintiffs would face a lengthy trial without any coverage, Plaintiffs were forced to settle the [*Nanogen*] *Action* at their own expense."

During the trial of the bad faith lawsuit, Kumar testified the technology in dispute in the Nanogen lawsuit was developed by Montgomery while he was employed at CombiMatrix. Richard Harris, president of Acacia, testified CombiMatrix settled the Nanogen lawsuit out of economic necessity.

In February 2008, the United States District Court for the Central District of California issued a ruling against National Union and in favor of Acacia and CombiMatrix. The court found there was coverage under the Policy, none of the Policy's exclusions applied, the settlement with Nanogen was "involuntary and in response to Defendant's breach of its duties," and "Plaintiffs

faced economic ruin and were forced to settle with Nanogen." The court awarded actual damages of nearly $21.5 million, prejudgment interest in the amount of about $10.29 million, and the present value of future royalty payments, attorney fees, and costs awarded in the amount of about $3.89 million.

National Union appealed the judgment and afterwards brought a motion to revest jurisdiction in the trial court to entertain a motion under rule 60(b) of the Federal Rules of Civil Procedure (28 U.S.C.). In this motion, National Union submitted documents showing that CombiMatrix had settled to satisfy Roche, not out of economic necessity.

In response to National Union's motion, Kumar submitted "a deliberately false declaration to the Court claiming that the Roche transaction had nothing to do with the settlement with Nanogen and that the settlement with Nanogen was 'because CombiMatrix was in need of money due to its defense costs in the Nanogen litigation, without reimbursement by National Union.' " Kumar failed to disclose the existence of documents in the CombiMatrix files, which stated the Roche agreement was expressly contingent upon settlement of the Nanogen case.

Acacia and CombiMatrix, with the assistance of Kumar, ultimately settled with National Union for a single lump-sum payment of $25 million. Defendants never revealed to National Union any of the facts that would have defeated their claims for insurance benefits under the Policy.

Strathmann's complaint concludes: "As a result of Defendants' false and fraudulent insurance claims made to National Union, and false, misleading and incomplete statements and testimony in the United States District Court for the Central District of California in their subsequent suit for payment of their claim, Defendants fraudulently obtained a judgment in the amount of $35,635,822. Defendants[] never revealed the truth about their claims, and instead after trial settled their false claims with National Union . . . for a payment of $25,000,000 to Acacia and CombiMatrix. [¶] . . . Defendants' conduct falls squarely within the policy underlying California Insurance Code §1871.7, which is to 'more effectively investigate and discover insurance frauds' and to 'halt fraudulent activities.' Enforcement of California Insurance Code §1871.7 in this case will further the policy goals set by the California legislature and will help protect the public from inflated insurance rates that result from insurance fraud."

## Procedural History

Defendants demurred to the complaint and filed a special motion to strike pursuant to the anti-SLAPP statute. Strathmann filed opposition and, before the hearing on the special motion to strike and demurrer, filed a first amended complaint.

The trial court granted the special motion to strike. In its tentative ruling, later adopted as the final ruling, the court stated these reasons for granting the motion: "Filing a lawsuit is an exercise of a party's constitutional right to petition for grievances and falls under CCP 425.16(b)(1). [¶] Plaintiff cannot frustrate the purpose of the SLAPP statute through a pleading tactic of combin[in]g protected and unprotected activity in one cause of action. [¶] Plaintiff cannot rely on the exception in CCP 425.17, as Plaintiff doesn't meet the requirements of CCP 425.17(b)(1), as Plaintiff would get relief greater than that of the general public, as Plaintiff stands to get a large portion of any award under Ins Code 1871.7(g)(iii)(IV). [¶] The alleged fraudulent claims which are the basis of this action were already litigated in Federal Court. The Court grants Plaintiff's Request for Judicial Notice at Ex 5 (Findings of Fact and Conclusions of Law following Trial) and Ex 6 (Judgment in Federal Court). [¶] Plaintiff, and the State, are in 'privity' with National Union, as all of the alleged fraudulent claims here are derivative of the claims of National Union. [¶] . . . [¶] Plaintiff also claims that certain issues were not litigated in the Federal Court action, but Plaintiff cannot split his cause of action. All issues related to the fraud claims were required to be litigated in the Federal Action. If it has been determined in a former action, it [is] binding notwithstanding the parties litigant [*sic*] may have omitted to urge for or against it matters which, if urged, would have produced an opposite result. [¶] Plaintiff cannot establish a probability of prevailing, as the statements made in the Federal action are protected by the litigation privilege of [Civil Code section] 47(b). [¶] Because the basis of the ruling . . . is the bar of collateral estoppel[], the court doesn't reach Plaintiff's evidence o[r] Defendants' evidence objections thereto."

The trial court deemed the demurrer to be moot and did not rule on it. The court struck Strathmann's first amended complaint on the ground "Plaintiff is not allowed to file an amended complaint while an anti-SLAPP motion is pending. (*Salma* 161 CA 4th 1275, 1280 [74 Cal.Rptr.3d 873].)" (Boldface omitted, italics added.)

A formal order granting the special motion to strike was entered in May 2011. Strathmann appealed from that order, and his appeal was assigned docket No. G045390. The order granting the special motion to strike is appealable under section 425.16, subdivision (i).

In July 2011, Defendants filed a motion to recover attorney fees in the amount of over $101,000, pursuant to section 425.16, subdivision (c)(1). Strathmann opposed the motion and moved to tax costs. The trial court granted the motion and awarded Defendants attorney fees and costs in the sum of $100,660.50. A minute order awarding Defendants attorney fees and costs was entered on August 30, 2011, and a judgment awarding Defendants attorney fees and costs was entered on September 22, 2011. Strathmann appealed from both the minute order and the judgment, and those appeals were assigned docket Nos. G045913 and G046017. We granted motions to consolidate all three appeals.

## DISCUSSION

## I.

### Strathmann's Complaint Is Protected by the Public Interest Exception to the Anti-SLAPP Statute.

█ "Section 425.16 provides for a special motion to strike '[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' (§ 425.16, subd. (b)(1).)" (*Cabrera v. Alam* (2011) 197 Cal.App.4th 1077, 1085 [129 Cal.Rptr.3d 74].) We independently review the trial court's order granting the special motion to strike under the de novo standard. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325–326 [46 Cal.Rptr.3d 606, 139 P.3d 2].)

Whether Strathmann's lawsuit falls within the public interest exception of section 425.17(b) is "a threshold issue, and we address it prior to examining the applicability of section 425.16." (*Navarro v. IHOP Properties, Inc.* (2005) 134 Cal.App.4th 834, 840 [36 Cal.Rptr.3d 385].) If Strathmann's lawsuit did come within section 425.17(b), then Defendants' special motion to strike should have been denied without reaching the merits of the motion.

### A. *Section 425.17(b)*

Section 425.17(b) states: "Section 425.16 does not apply to any action brought solely in the public interest or on behalf of the general public if all of the following conditions exist: [¶] (1) The plaintiff does not seek any relief greater than or different from the relief sought for the general public or a class of which the plaintiff is a member. A claim for attorney's fees, costs, or penalties does not constitute greater or different relief for purposes of this subdivision. [¶] (2) The action, if successful, would enforce an important right affecting the public interest, and would confer a significant benefit,

whether pecuniary or nonpecuniary, on the general public or a large class of persons. [¶] (3) Private enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter."

The Legislature enacted Code of Civil Procedure section 425.17 in 2003 to curb the "disturbing abuse" of the anti-SLAPP statute to "undermine[] the exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, contrary to the purpose and intent of Section 425.16." (§ 425.17, subd. (a); see *Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 316 [86 Cal.Rptr.3d 288, 196 P.3d 1094] (*Club Members*).) "According to the sponsor of Code of Civil Procedure section 425.17, Senator Sheila Kuehl, the same types of businesses who used the SLAPP action were inappropriately using the anti-SLAPP motion against their public-interest adversaries. Hence, the Legislature expressly designed subdivision (b) of section 425.17 to prevent the use of the anti-SLAPP device against 'specified *public interest actions*,' among others. (Assem. Com. on Judiciary, Rep. on Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 2.)" (*Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 913 [20 Cal.Rptr.3d 385].)

### B. *Brought Solely in the Public Interest or on Behalf of the General Public*

■ Not all public interest or class actions are intended to be exempt from the anti-SLAPP law. (*Blanchard v. DIRECTV, Inc., supra*, 123 Cal.App.4th at p. 913.) To be exempt, the action must be "brought solely in the public interest or on behalf of the general public" and meet the three conditions set forth in section 425.17(b). "[T]he term 'public interest' is used to define suits brought for the public's good or on behalf of the public." (*Club Members, supra*, 45 Cal.4th at p. 318.) The term "solely" as used in section 425.17(b) "expressly conveys the Legislative intent that section 425.17(b) not apply to an action that seeks a more narrow advantage for a particular plaintiff." (*Club Members, supra*, at pp. 316–317.)

To determine whether Strathmann's qui tam lawsuit met those definitions, we rely on the allegations of the complaint because the public interest exception is a threshold issue based on the nature of the allegations and scope of relief sought in the prayer.[3] (See *Northern Cal. Carpenters Regional Council v. Warmington Hercules Associates* (2004) 124 Cal.App.4th 296, 300 [20 Cal.Rptr.3d 918] [concluding action was brought solely in the public

---

[3] In any case, no party has cited to evidence in the record (other than the complaint) bearing on whether the lawsuit was brought in the public interest or on behalf of the general public.

interest based on allegations of the complaint].) We consider the allegations of Strathmann's complaint in light of Insurance Code section 1871.7 and the nature of a qui tam lawsuit, matters to which we first turn.

■ Under subdivision (b) of Insurance Code section 1871.7, "[e]very person" who engages in insurance fraud in violation of Penal Code section 549 or 550 is subject to penalties and assessments. (See *State of California ex rel. Nee v. Unumprovident Corp.* (2006) 140 Cal.App.4th 442, 447 [44 Cal.Rptr.3d 491].) Section 1871.7, subdivision (e)(1) expressly authorizes any "interested person[]" to bring a qui tam action to recover damages and penalties for fraudulent insurance claims both for that person and for the State of California. (Ins. Code, § 1871.7, subd. (e)(1); see generally *Weitzman, supra,* 107 Cal.App.4th at pp. 538, 545.) The person who brings the qui tam action, called the "relator," stands in the shoes of the People of the State of California, who are deemed to be the real party in interest. (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1214 [48 Cal.Rptr.3d 108, 141 P.3d 225]; *Weitzman, supra,* at p. 538.) The relator in a qui tam action under section 1871.7 does not personally recover damages but, if successful, receives a substantial percentage of the recovery as a bounty. (Ins. Code, § 1871.7, subd. (g).)

A complaint under Insurance Code section 1871.7, filed by an interested person, must be served on the district attorney and the Insurance Commissioner, and must be filed in camera, where it remains under seal for at least 60 days. (Ins. Code, § 1871.7, subd. (e)(2).) Within that 60-day period, the district attorney or the Insurance Commissioner may opt to take over an action brought by an interested person. (*Id.,* § 1871.7, subd. (e)(4)(A).) If the district attorney and the Insurance Commissioner decline to do ·so, the interested person has the right to pursue the action. (*Id.,* § 1871.7, subd. (e)(4)(B).)

■ Insurance Code section 1871.7, subdivision (b) authorizes civil penalties of $5,000 to $10,000 for each fraudulent claim presented to an insurance company, assessment of up to three times the amount of each claim for compensation, and other equitable relief. Under the bounty hunter provision of section 1871.7, subdivision (g), if the district attorney or the Insurance Commissioner does not proceed with the action, an interested person who successfully brings and pursues the action under section 1871.7 is entitled to 40 percent to 50 percent of the proceeds recovered and may recover from the defendant reasonable expenses, including attorney fees. (Ins. Code, § 1871.7, subd. (g)(2)(A); see *Weitzman, supra,* 107 Cal.App.4th at p. 547.)

■ Strathmann is an "interested person" bringing this action as a qui tam relator. "A *qui tam* relator is essentially a self-appointed private attorney

general, and his recovery is analogous to a lawyer's contingent fee. The relator has no personal stake in the damages sought—all of which, by definition, were suffered by the government." (*U.S. ex rel. Milam v. University of Texas M.D. Anderson Cancer Center* (4th Cir. 1992) 961 F.2d 46, 49.) A qui tam action "is a type of private attorney general lawsuit" (*In re Marriage of Biddle* (1997) 52 Cal.App.4th 396, 398 [60 Cal.Rptr.2d 569]), in which "the qui tam plaintiff stands in the shoes of the state or political subdivision" (*Wells v. One2One Learning Foundation, supra*, 39 Cal.4th at p. 1214). "[A]lthough *qui tam* actions allow individual citizens to initiate enforcement against wrongdoers who cause injury to the public at large, the Government remains the real party in interest in any such action." (*Minotti v. Lensink* (2d Cir. 1990) 895 F.2d 100, 104.)

Section 425.17(b) was intended to exempt such private attorney general actions from the anti-SLAPP statute: "This public interest exception, supporters say, parallels the existing exception for actions by the attorney general and public prosecutors. Just as actions by the attorney general are not now subject to the anti-SLAPP motion, actions by private attorneys general would not be subject to the anti-SLAPP procedure. . . . '. . . Since the statute already exempts actions filed by public prosecutors, it should provide a parallel protection when people are acting only in the public interest as private attorneys general, and are not seeking any special relief for themselves.' " (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, pp. 11–12.)

As a qui tam plaintiff, Strathmann is acting in the public interest as a private attorney general and should be accorded the " 'parallel protection' " contemplated by the Legislature. (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 515 (2003–2004 Reg. Sess.) as amended June 27, 2003, p. 12.) Defendants argue Strathmann is not pursuing this lawsuit solely for the public benefit because "he seeks to personally recover 'at least 40% but not greater than 50% of the proceeds of this action,' which could result in an award to Strathmann of between $30 million and $37.5 million." But Strathmann, as a qui tam plaintiff, brought this lawsuit "on behalf of the general public" (§ 425.17(b)). The word "solely" in section 425.17(b) modifies the term "in the public interest," not "on behalf of the general public." That is, the phrase "solely in the public interest or on behalf of the general public" does not mean *solely* "on behalf of the general public." (*Ibid.*) If it did, then section 425.17(b)(1) would be unnecessary because a lawsuit brought solely on behalf of the general public would not, by definition, include any individual claim for relief. A claim brought on behalf of the general public might include some kind of individual relief, in which case, it would have to be determined under section 425.17(b)(1) whether that relief is greater than or different from the relief sought for the general public.

Strathmann does not seek personal relief within the meaning of section 425.17(b); rather, he sought recovery of the bounty, to which he might be entitled under Insurance Code section 1871.7, subdivision (g)(2)(A). " 'The driving force behind the false claims concept is the providing of incentives for *individual citizens* to come forward with information uniquely in their possession and to thus aid the Government in [ferreting] out fraud.' " (*State ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220, 1231 [48 Cal.Rptr.3d 144, 141 P.3d 256].) The bounty advances the public purpose and benefit by encouraging private qui tam actions; "[i]ndeed, this prospect of reward may be the only means of inducing such private parties to come forward with their information." (*Ibid.*)

In *Club Members, supra*, 45 Cal.4th at page 312, the California Supreme Court held section 425.17(b) did not extend to an association of Sierra Club members that sued the club over a board of directors election because the complaint included claims to directly benefit the plaintiffs. *Club Members* was not a qui tam action. The members' association filed a lawsuit to install one of the plaintiffs and four other unsuccessful candidates on the Sierra Club's board of directors; to publish, at the Sierra Club's expense, an article in response to an editorial disseminated to Sierra Club chapter newsletters; and to disseminate an urgent election notice with ballots for the 2005 election. (*Club Members, supra*, at pp. 313, 317.) Based on those requests for relief, the Supreme Court agreed with the Court of Appeal that "portions of the prayer for relief sought a personal advantage by advancing plaintiffs' own interests." (*Id.* at p. 317, fn. omitted.)

■ In contrast, the bounty Strathmann seeks is analogous to a lawyer's contingent fee (*U.S. ex rel. Milam v. University of Texas M.D. Anderson Cancer Center, supra*, 961 F.2d at p. 49), which is not considered personal relief under section 425.17(b)(1), and which is necessary to encourage qui tam actions. Payment of a bounty to a qui tam plaintiff should not, in itself, disqualify a lawsuit from protection under section 425.17(b). Otherwise, private qui tam actions to enforce Insurance Code section 1871.7 would rarely if ever meet the conditions of section 425.17(b)—a result at odds with the statutory purpose. Although the qui tam plaintiff may forego the bounty, doing so would remove the very incentive recognized as necessary to induce the plaintiff to bring the qui tam action in the first place.

Defendants assert at several places in the respondents' brief that Strathmann "was in a contractual relationship with National Union to be compensated for his role as an alleged 'whistle-blower' . . . ." Defendants do not support these assertions with a citation to the record. " 'The appellate court is not required to search the record on its own seeking error.' [Citation.] Thus, '[i]f a party fails to support an argument with the necessary citations to the record, . . . the

argument [will be] deemed to have been waived. [Citation.]' [Citations.]" (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [19 Cal.Rptr.3d 416].)

In fact, evidence submitted by Defendants in support of the anti-SLAPP motion suggests Strathmann was not in a contractual relationship with National Union. In support of the special motion to strike, Defendants asked the trial court to take judicial notice of a complaint for declaratory relief against Strathmann, which National Union had filed in March 2009. The complaint sought a declaration that National Union could use certain exhibits in support of its posttrial motion to reopen the bad faith lawsuit and that Strathmann had no right to prevent National Union from using the exhibits. The complaint alleged that National Union had refused Strathmann's demand for a percentage of any reduction of the judgment in the bad faith lawsuit as compensation for letting National Union use trial exhibits Strathmann had retrieved from the court clerk's office. Thus, National Union's complaint against Strathmann, even if its allegations are accepted as true, does not show a contractual relationship existed between National Union and Strathmann.

### C. *Three Conditions to the Public Interest Exception*

#### 1. *Condition No. 1: No Greater or Different Relief*

█ The first condition of section 425.17(b) is the plaintiff does not seek any relief greater than or different from the relief sought for the general public. (§ 425.17(b)(1).) Strathmann did not allege he suffered any injury for which relief could be granted. What Strathmann sought was the bounty available under Insurance Code section 1871.7, subdivision (g)(2)(A), which, as we have explained, is similar to an attorney's contingent fee and advances the public purpose of encouraging qui tam actions. With respect to other relief sought, section 425.17(b)(1) states, "[a] claim for attorney's fees, costs, or penalties does not constitute greater or different relief for purposes of this subdivision."

█ To the extent the bounty under Insurance Code section 1871.7, subdivision (g)(2)(A) may be characterized as "relief," it cannot be greater than or different from the relief sought on behalf of the People of the State of California. Both the bounty and the relief sought on behalf of the People are money, and the bounty cannot exceed 50 percent of the relief awarded. (*Ibid.*) The cases cited by Defendants are distinguishable because, in each, the plaintiff sought personal relief for the plaintiff's personal harm. (See *Club Members, supra*, 45 Cal.4th at p. 317 [prayer for relief advanced the plaintiffs' own interests, as discussed above]; *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050, 1066–1067 [28

Cal.Rptr.3d 933] [the plaintiff sought personal damages under statute prohibiting age discrimination]; *Blanchard v. DIRECTV, Inc., supra,* 123 Cal.App.4th at p. 916 [the plaintiffs failed to satisfy public interest exception because they sought "an accounting to them and restitution to them of moneys they paid to [the defendant]"]; *Holbrook v. City of Santa Monica* (2006) 144 Cal.App.4th 1242, 1250 [51 Cal.Rptr.3d 181] [city council members' action seeking to prevent late-night council meetings did not fall within public interest exception because it sought relief personal to council members who wanted particular working hours for themselves].)

### 2. Condition No. 2: Enforce Important Right or Confer Public Benefit

The second condition of section 425.17(b) is "[t]he action, if successful, would enforce an important right affecting the public interest," and would confer a significant benefit, either pecuniary or nonpecuniary, on the general public. (§ 425.17(b)(2).) Defendants do not dispute this condition is met. The purpose of the Insurance Frauds Prevention Act (Ins. Code, § 1871 et seq.) is to supplement government efforts to fight insurance fraud without creating new and expensive bureaucracies. (*Weitzman, supra,* 107 Cal.App.4th at pp. 548, 550.) "It is in the government's interest to have insurers investigate and prosecute such proceedings. The government serves to gain both in terms of fraud prevention and financially from such actions, especially given limited investigative and prosecutorial resources available to it." (*Id.* at p. 562.)

The general public also benefits from qui tam actions to enforce Insurance Code section 1871.7, because fraudulent insurance claims result in higher premiums. (*Weitzman, supra,* 107 Cal.App.4th at pp. 550, 562.) "Insureds are the indirect victims who pay higher premiums due to the prevalence of insurance fraud." (*Id.* at p. 562.)

### 3. Condition No. 3: Private Enforcement Is Necessary

The third condition of section 425.17(b) is "[p]rivate enforcement is necessary and places a disproportionate financial burden on the plaintiff in relation to the plaintiff's stake in the matter." (§ 425.17(b)(3).) In this case, private enforcement is necessary because neither the Attorney General nor the Insurance Commissioner has intervened to prosecute the action. Strathmann's "stake in the matter" is the prospect of receiving the bounty if the lawsuit is successful. But the bounty is offered precisely as an inducement for people with information about insurance fraud to come forward and place themselves under the significant personal and financial stress of pursuing difficult, time-consuming, and often lengthy litigation. This stake must be discounted by the very real risk the qui tam plaintiff will lose or, if successful, the judgment cannot be collected.

In addition, the qui tam plaintiff might be subject to the risk that, if the lawsuit is unsuccessful, he or she will be liable for the prevailing party's attorney fees and costs. The award of over $100,000 in attorney fees and costs against Strathmann personally demonstrates this point.[4]

## II.

### The Order Granting Defendants' Motion for Attorney Fees Must Be Reversed.

Because Defendants were the prevailing parties on a special motion to strike, the trial court awarded them over $100,000 in attorney fees and costs pursuant to section 425.16, subdivision (c)(1). As we are reversing the order granting Defendants' special motion to strike, we also reverse the order and judgment granting Defendants' motion for attorney fees. (*C9 Ventures v. SVC-West, L.P.* (2012) 202 Cal.App.4th 1483, 1488–1489 [136 Cal.Rptr.3d 550].)

## III.

### When Strathmann Filed an Amended Complaint, the Demurrer Should Have Been Taken off Calendar.

Defendants' demurrer to Strathmann's complaint raised precisely the same substantive challenges as the special motion to strike, i.e., collateral estoppel and statute of limitations. Before the hearing on the demurrer and special motion to strike, Strathmann filed a first amended complaint. At the hearing, the trial court struck the amended complaint on the ground amendment was not permitted in response to a special motion to strike under the anti-SLAPP statute. The court then declined to rule on the demurrer because granting the special motion to strike made the demurrer moot.

The parties argue whether Strathmann could file an amended complaint in response to the special motion to strike. In any event, Strathmann had a statutory right to file an amended complaint in response to the demurrer. Code of Civil Procedure section 472 grants a plaintiff the right to file an amended complaint in response to a demurrer at any time before the hearing on the demurrer. "[T]he purpose of the statute permitting amendments as of right before an answer is filed or a demurrer is ruled upon is to

---

[4] Strathmann has filed a motion requesting we take judicial notice of (1) a lien that Defendants placed on his property to enforce the judgment of attorney fees and costs, and (2) a notice of filing of undertaking on appeal, filed in the superior court in this case. We deny the motion because neither document is relevant to the issues raised on appeal.

promote judicial efficiency and reduce the costs of litigation." (*Barton v. Khan* (2007) 157 Cal.App.4th 1216, 1221 [69 Cal.Rptr.3d 238].) "The filing of the first amended complaint rendered [the defendant]'s demurrer moot since ' "an amendatory pleading supersedes the original one, which ceases to perform any function as a pleading. [Citations.]" [Citation.]' " (*Sylmar Air Conditioning v. Pueblo Contracting Services, Inc.* (2004) 122 Cal.App.4th 1049, 1054 [18 Cal.Rptr.3d 882].)

When Strathmann filed the amended complaint, the hearing on the demurrer should have been taken off calendar. (*Barton v. Khan, supra*, 157 Cal.App.4th at p. 1221.) Since there was no demurrer for the trial court to rule on, and the amended complaint had superseded the complaint to which the demurrer was directed, we decline to address issues raised by the demurrer.

### DISPOSITION

The order granting the special motion to strike and the order and judgment awarding Defendants' attorney fees and costs are reversed. The matter is remanded for further proceedings. Appellant shall recover costs incurred on appeal.

Rylaarsdam, Acting P. J., and Aronson, J., concurred.