Filed 3/12/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MMM HOLDINGS, INC., et al., | |
| Plaintiffs and Appellants, | G053739 |
| v. | (Super. Ct. No. 30-2015-00822123) |
| MARC REICH, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from an order of the Superior Court of Orange County, Martha K. Gooding, Judge. Affirmed.

Ervin Cohen & Jessup, Michael C. Lieb, Patrick A. Fraioli, and Leemore L. Kushner for Plaintiffs and Appellants.

Spach, Capaldi & Waggaman, Madison S. Spach, Jr., and Thomas E. Walling for Defendant and Respondent.

\* \* \*

Plaintiffs, MMM Holdings, Inc. (MMM), and MSO of Puerto Rico, Inc. (MSO), sued defendant Marc Reich, the attorney who represented their adversary in a whistleblower qui tam action filed against plaintiffs in the United States District Court.[1] Alleging causes of action for claim and delivery, conversion, civil theft, unjust enrichment, and unfair competition, plaintiffs contend Reich received, wrongfully possessed, and refused to turn over, some 26,000 electronically stored documents his client, Jose "Josh" Valdez, took with him in 2010 when he was terminated by MSO for his allegedly "vocal opposition to what he perceived as Plaintiffs' fraudulent practices."

Reich filed a special motion to strike the complaint under Code of Civil Procedure section 425.16, the anti-SLAPP (strategic lawsuit against public participation) statute.[2] The court granted the motion, concluding the claims asserted by plaintiffs against Reich involved Reich's petitioning activity protected by the anti-SLAPP statute, and that plaintiffs had not shown, and could not show, a probability they would prevail on any of their claims. We conclude the court did not err and affirm the order.

---

[1] "A qui tam action has been defined as follows, 'An action brought under a statute that allows a private person to sue for a penalty, part of which the government or some specified public institution will receive.' [Citations.] The term 'qui tam' comes from the Latin expression 'qui tam pro domino rege quam pro se ipso in hac parte sequitur,' which means, '"who pursues this action on our Lord the King's behalf as well as his own".'" (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538.)

[2] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

FACTS

The following facts are taken from the complaint, declarations, and evidence submitted in connection with the special motion to strike.[3] (§ 425.16, subd. (b)(2) ["In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."].)

*The Earlier Lawsuits*

MMM and its subsidiary, MSO, are Puerto Rico corporations. MMM Healthcare, LLC and PMC Medicare Choice, LLC (collectively, the plans) are wholly owned subsidiaries of MMM that operate Medicare Advantage plans in Puerto Rico through a broad network of more than 5,000 contracted providers. MSO manages the physician network under which the plans provide services to their members, and in that regard, acts as an agent for the plans. The plans are health maintenance organizations that contract with the Centers for Medicare and Medicaid Services.[4]

Valdez served as president of MSO from April 2010 until his termination in December 2010. According to Reich, Valdez contends he was terminated in retaliation for his vocal opposition to plaintiffs' fraudulent practices. Plaintiffs contend Valdez was terminated because he was incompetent and failed to perform his job duties.

---

[3] We limit our recitation to facts we deem legally significant.

[4] "The Centers for Medicare & Medicaid Services, CMS, is part of the Department of Health and Human Services." (<https://www.cms.gov/About-CMS/About-CMS.html> [as of Jan. 22, 2018].) It administers programs including Medicare, Medicaid, the Children's Health Insurance Program, and the Health Insurance marketplace.

3

While employed by MSO, Valdez possessed a company laptop and two personal laptops that contained electronic data including emails and attachments he had sent or received in the course of his employment; he also had a personal computer tablet that contained notes he had taken during the course of his employment (collectively the computers). When he was terminated, Valdez kept the computers and the electronic files and notes they contained.

Reich has represented Valdez and his family since approximately 1997. After he was terminated, Valdez provided the computers to Reich's law firm. According to Reich, he and his firm segregated all the files potentially subject to the attorney-client privilege. Reich's handling and later dissemination of the documents is the subject of alleged wrongdoing in this case.

Following Valdez's termination in December 2010, plaintiffs sought return of all company documents and property. MSO contends a clause in Valdez's employment agreement required Valdez to immediately deliver the notes and all other documents, information, and data to MSO upon his termination of employment. Reich contends the clause is unenforceable because the documents contain evidence of fraud against the United States government.

Within five months of Valdez's termination, Valdez's attorneys, including Reich, filed under seal a qui tam action in the United States District Court for the Central District of California entitled *United States of America ex rel. Jose R. Valdez v. Aveta, Inc., et al.*, case No. CV11-03343 GAF(JCx) (the qui tam action).[5] Reich declared he and his co-counsel used unprivileged documents found in the electronic files from the computers to prepare the pleadings in the qui tam action.

The qui tam action alleges plaintiffs overcharged Medicare by more than $1 billion dollars between 2007 and 2010 by manipulating Medicare Part C. The

---

[5] In February 2015, the district court granted a motion to transfer the qui tam action to the District of Puerto Rico.

4

operative first amended complaint alleges a violation of the False Claims Act (31 U.S.C., § 3729 et seq.) and Valdez's retaliatory discharge. The gist of the qui tam action is that plaintiffs knowingly submitted inaccurate, incomplete, and misleading data to the government in order to increase payments made to the plans and that plaintiffs retaliated against Valdez for his speaking out about plaintiffs' overbilling practices.

It appears not much occurred between April 2011 and January 2014. Plaintiffs apparently stopped demanding documents and were unaware of the qui tam action. In January 2014, the United States declined to intervene in the qui tam action. The complaint was unsealed and served. Plaintiffs first became aware of the qui tam action at that time.

With the qui tam action now underway, in August 2014 plaintiffs' counsel sent a letter to Valdez's attorney, Thomas H. Bienert, Jr., (with a copy to Reich) inquiring as to whether Valdez or his counsel had any company documents. In September 2014, Bienert responded yes, and in October 2014, another attorney from Reich's firm sent plaintiffs an external hard drive that contained over 26,000 emails and other documents of plaintiffs and/or their affiliates.[6]

Plaintiffs allege that in or about December 2014, MMM first learned that in October 2014 Reich converted for his own use and then e-mailed a digital copy of some of the documents to another attorney, Freddie Perez of Puerto Rico. Plaintiffs' attorney, Christopher Joyce, declared this revelation occurred during the deposition of plaintiffs' CEO Richard Shinto in an action filed by plaintiffs and their affiliates against a terminated medical provider seeking recoupment of improper payments (the *Marini* action). Perez represented the *Marini* defendants, who filed counterclaims against plaintiffs herein alleging improper contract termination and inappropriate claim denials. During the deposition, Perez asked Shinto to review four emails provided to him by

_____

[6] Plaintiffs characterize the drive as a thumb drive.

5

Reich.  Plaintiffs' attorney, Patrick A. Fraioli, declared the four emails are confidential and proprietary.

Plaintiffs allege Reich intentionally sought out Perez for his own purposes and without direction from Valdez (whom plaintiffs allege was incapacitated) in violation of Reich's "ethical duties and California law" and that he provided Perez with copies of plaintiffs' documents having no connection or relation to the qui tam action for Perez's potential use in unrelated litigation.  Reich declared the documents are related to *both* the qui tam action and the *Marini* action "because both actions involve [p]laintiffs' retaliation against providers for providing expensive, but necessary, care and the failure to pay non-network providers for emergency services."  Thus, Reich contends he provided documents to Perez to help prove the common issue of plaintiffs' failure to pay non-plan providers for emergency services provided to plaintiffs' insureds.

Aside from Perez, plaintiffs also allege Reich provided documents to "numerous other individuals throughout the United States" including attorneys not associated with Valdez or the qui tam action.  Based on evidence submitted in connection with the anti-SLAPP motion, this allegation appears to relate in part to a 2012 class arbitration filed by medical health service providers alleging plaintiffs and their affiliates underpaid medical specialists under the terms of their contracts in 2010 (the *Vazquez* arbitration).  Attorney Alan Plutzik represented the claimants.  According to Attorney Joyce, all the claims in the *Vazquez* arbitration relate to alleged breach of provider contracts, not fraud.[7]

---

[7]     The demand for arbitration alleges counts for breach of contract, breach of implied duty and covenants to exercise good faith and fair dealing, and restitution/unjust enrichment.

Plaintiffs' evidence includes a so-called "Dissemination Chart" identifying certain of plaintiffs' documents that Reich admits he provided to Plutzik in 2011, 2013, and 2014.[8] Plaintiffs' attorneys, Joyce and Paul Klausner, declare the "CMS Fee Schedule Rationale," one of the documents provided to Plutzik, is protected by the attorney-client privilege and work product doctrine. Reich disputes this characterization because the document discusses economic benefits and drawbacks of various options in making a business decision and does not contain legal advice or reference any lawyer's name.[9]

Joyce also declared another document that lists the names, specialties, and 2010 bonus payments of specialist medical providers was also disseminated to Plutzik, and he states this document contains highly confidential and proprietary information akin to a customer list. Klausner also declared another document, an October 27, 2010 e-mail from Shinto to Valdez was privileged. Reich denied any documents he provided Plutzik were privileged.

Reich justified providing documents to Plutzik by declaring Plutzik was one of the attorneys who considered representing Valdez in the qui tam action. Further, Reich declared Plutzik was attempting to prove in the *Vazquez* arbitration that plaintiffs underpaid fee-for-service medical providers, and that was one of the facts Valdez was trying to prove in the qui tam action. Reich reasoned the documents could assist Plutzik in his proof, which would collaterally estop plaintiffs from denying the fact in the qui tam

---

[8]      Reich also provided documents to Richard Graffam, Gary Lincenberg, Matt Smith, Kyle Eisenmann, Scott Bursor, Justin Berger, Jim Spertus, Robert Nelson, Kevin Budner, Carlos A. Del Valle Cruz, and Armando Lamourt. He declares these individuals are attorneys, each of whom (except Graffam) he contacted to consider whether to represent Valdez in the qui tam action. Plaintiffs do not elaborate on any of these individuals.

[9]      Reich offered to provide the document to the trial court for an in camera review. Apparently, the trial court declined, as we have not seen the document.

action, and therefore sharing of documents served their common interest. Reich pointed out that in both the Vazquez arbitration and the qui tam action, it was alleged plaintiffs underpaid providers by failing to pass on Medicare fee increases. According to Reich, this was the basis for liability under the False Claims Act.

Plaintiffs allege the computers have not been provided to them, and, to their dismay, Reich has not retrieved or attempted to retrieve documents that remain in the hands of others. Even so, Reich points out in addition to the hard drive given to plaintiffs in October 2014, in October 2015, Reich's counsel provided plaintiffs' counsel with all the electronic handwritten notes Valdez provided to Reich's firm. Therefore, according to Reich, plaintiffs have had a complete set of all disputed documents since October 2015.

*The Current Case*

Plaintiffs filed their complaint in November 2015. They alleged causes of action for claim and delivery, conversion, civil theft (receipt of stolen property — violation of Pen. Code, § 496), restitution/unjust enrichment, and unfair competition (violation of Bus. & Prof. Code, § 17200 et seq.). All the causes of action revolve around plaintiffs' basic contention Reich wrongfully took possession of documents, wrongfully disclosed the documents to third parties, and wrongfully refuses to return them. Plaintiffs request, inter alia, damages of at least $100,000, punitive and exemplary damages, disgorgement of all "improper benefits, profits and/or gains, and restitution," an order enjoining Reich from continuing to violate his ethical obligations as an attorney an order enjoining Reich from using the documents and an order for immediate disclosure and return of the documents.

In January 2016, Reich moved to strike the complaint on grounds the case is a SLAPP. The court granted the motion and found the claims asserted by plaintiffs against Reich involve Reich's petitioning activity protected by the anti-SLAPP statute,

8

because the principal thrust or gravamen of each of plaintiffs' causes of action is that Reich, while acting as Valdez's attorney, received purportedly stolen, confidential and/or privileged documents from his client who was or was about to be and still is embroiled in litigation with plaintiffs and that he refuses to return them to plaintiffs despite their demand. The court also found plaintiffs had not shown, and could not show, a probability they would prevail on any of their claims, because all of plaintiffs' claims are directed at activity protected by the litigation privilege.

Plaintiffs timely appealed. The order granting the special motion to strike is appealable. (§ 425.16, subd. (i).)


DISCUSSION


*General Principles of Applicable Law*

"A SLAPP suit — a strategic lawsuit against public participation—seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055 (*Rusheen*).) The Legislature has made SLAPP suits subject to a special motion to strike. (*Id*. at pp. 1055-1056.)

"Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success. [The Supreme Court has] described this second step as a 'summary-judgment-like procedure.' [Citation.] The court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to

determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.'" (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385.) It has become common to refer to the first step as "prong one" of the analysis and the second step as "prong two."

We engage in the same analysis in our de novo review. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820.)


*Reich's Conduct Arises from Protected Activity*

"At the first step of the anti-SLAPP analysis, a court considers 'whether the challenged claims arise from acts in furtherance of the defendants' right of free speech or right of petition under one of the categories set forth in section 425.16, subdivision (e). [Citation.] In doing so, "[w]e examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies . . . ." [Citation.]' [Citation.] The 'gravamen is defined by the *acts on which liability is based*, not some philosophical thrust or legal essence of the cause of action.'" (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 404-405.)

Section 425.16, subdivision (e), sets forth four categories of protected activity. Relevant here, section 425.16, subdivision (e)(4), defines protected activity to include "any . . . conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."[10]

_____

[10] The trial court relied principally on *Finton Construction, Inc. v. Bidna & Keys* (2015) 238 Cal.App.4th 200 and *Bergstein v. Stroock & Strook & Lavan LLP* (2015) 236 Cal.App.4th 793. Both of these cases featured claims against a lawyer based on the use of documents wrongfully obtained from the plaintiffs to pursue litigation on behalf of the lawyer's client against the plaintiffs. As we shall explain, plaintiffs' principal complaint here is that in addition to using plaintiffs' documents to pursue litigation against plaintiffs directly on behalf of his client, Valdez, Reich transmitted some of the documents to *other* lawyers who used them in pursuing litigation against

10

Plaintiffs allege five causes of action, all of which arise from Reich's use of the documents he received from Valdez. The gravamen of plaintiffs' causes of action is that Reich improperly distributed documents beyond what was permissible in his position as Valdez's counsel in the qui tam action. We begin by recognizing plaintiffs have conceded, as they must, Reich's use of documents received from Valdez in connection with the qui tam action constitutes protected activity.[11] To the extent distribution for use by the qui tam action attorneys can be disentangled from distribution for use by non-qui tam action attorneys, we are thus called upon to decide only whether Reich's transmittal of documents to non-qui tam action attorneys is protected. But as we will explain, it is difficult to disentangle the two purposes; they significantly overlap.

What is clear, however, is that the distribution of documents for either purpose was done "*in furtherance of* the exercise of the constitutional right of petition" with respect to the Perez documents and "*in furtherance of* the exercise of the constitutional right . . . of free speech" with respect to the Plutzik documents.[12]

---

plaintiffs on claims made by their own clients. For this reason, the question whether this activity is protected as arising from the rights of petition or free speech fits more comfortably under section 425.16, subdivision (e)(4), rather than subdivision (e)(1) or (e)(2).

[11] In their opposition filed in the trial court, plaintiffs stated they do not dispute Reich's initial receipt and "privilege screen," as well as use of nonprivileged documents in the qui tam action, are protected activity under prong one. In their reply brief in this court, plaintiffs state they "did not sue Reich because he received the [documents]. Nor did they sue him for using them to prosecute a lawsuit on behalf of his client." This, of course, is contrary to their pleaded causes of action for conversion and civil theft based on receiving stolen property.

[12] We acknowledge that an arbitrator is not a "judicial body" and an arbitration proceeding is not an "official proceeding" within the meaning of section 425.16, subdivisions (e)(1) and (e)(2). (See *Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 5 [Private arbitration "is a private alternative to a judicial proceeding. It is not an 'official proceeding' because it is a nongovernmental activity not reviewable by administrative mandate or required by statute"].) The

(§ 425.16, subd. (e)(4), italics added.) Each distribution and use of the documents was done to further litigation efforts, either on behalf of Valdez or on behalf of others. Nothing in subdivision (e)(4) limits the protected activity to petitioning or speech on behalf of a particular client. The question is simply whether the conduct was done *in furtherance of* the right of petition or speech. The more difficult question is whether the petitioning activity being "furthered" was "in connection with a public issue or an issue of public interest," a topic to which we now turn.

The anti-SLAPP statute does not define the terms "public issue" or "public interest." "The terms are, as one court stated, 'inherently amorphous and thus do not lend themselves to a precise, all-encompassing definition.' [Citation.] Another court has stated, somewhat tautologically, that '"an issue of public interest" . . . is any issue in which the public is interested.' [Citations.] Nevertheless, 'judges and attorneys will, or should, know a public concern when they see it.'" (*Healthsmart Pacific, Inc. v. Kabateck* (2016) 7 Cal.App.5th 416, 428 (*Healthsmart*).)

We first explore the nature of qui tam litigation, which unquestionably involves a public issue or a matter of public interest. A qui tam action is one brought under a statute that allows a private person to sue as a private attorney general to recover damages or penalties, all or part of which will be paid to the government. (*People ex rel. Allstate Ins. Co. v. Weitzman* (2003) 107 Cal.App.4th 534, 538.) As explained by another panel of this court, "'a *qui tam* relator is essentially a self-appointed private attorney general, and his recovery is analogous to a lawyer's contingent fee. The relator has no personal stake in the damages sought — all of which, by definition, were suffered by the government.' [Citation.] A qui tam action 'is a type of private attorney general lawsuit' [citation], in which 'the qui tam plaintiff stands in the shoes of the state or political subdivision' [citation]. '[A]lthough *qui tam* actions allow individual citizens to initiate

transmittal of documents to Plutzik for use in the Vasquez arbitration was nonetheless a communicative act in furtherance of Reich's constitutional right of free speech.

enforcement against wrongdoers who cause injury to the public at large, the Government remains the real party in interest in any such action.'" (*People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 500-501 (*Strathmann*).)

In *Strathmann,* the relator sought recovery under Insurance Code section 1871.7, subdivision (g)(2)(A), concerning false or fraudulent insurance claims. (*Strathmann, supra,* 210 Cal.App.4th at p. 502.)  There, we concluded the qui tam action met the public interest exception to the anti-SLAPP statute under section 425.17, subdivision (b).[13]  (*Id.* at p. 492.)  While analyzing the qui tam action in *Strathmann*, we noted, "'"The driving force behind the false claims concept is the providing of incentives for *individual citizens* to come forward with information uniquely in their possession and to thus aid the Government in [ferreting] out fraud."'  [Citation.]  The bounty advances the public purpose and benefit by encouraging private qui tam actions; '[i]ndeed, this prospect of reward may be the only means of inducing such private parties to come forward with their information.'"  (*Id.* at p. 502, italics in original.)

Outside the qui tam context, in *Healthsmart*, the court concluded statements during a news report and radio program about a "massive medical fraud lawsuit" filed against hospitals and doctors alleging kickbacks paid to doctors were made in connection with a public issue or an issue of public interest.  (*Healthsmart, supra,* 7 Cal.App.5th at pp. 424-427.)  The court concluded defendants' activity was protected under section 425.16, subdivision (e)(4), because, inter alia, members of the public, as consumers of medical services, have an interest in being informed of issues concerning particular doctors or healthcare facilities and that the assertions of a widespread illegal physician

---

[13]     "Not all public interest or class actions are intended to be exempt from the anti-SLAPP law.  [Citation.]  To be exempt, the action must be 'brought solely in the public interest or on behalf of the general public' and meet the three conditions set forth in section 425.17(b)."  (*Strathmann, supra,* 210 Cal.App.4th at p. 499.)

kickback scheme raise issues concerning the integrity of the health care system, which is a matter of widespread public concern.[14] (*Id.* at p. 429.)

As in *Healthsmart,* we conclude Reich's conduct is protected under section 425.16, subdivision (e)(4).  Reich's distribution of documents to others was done in connection with the qui tam action *and issues related to it*, all of which concern a public issue or an issue of public interest.

Reich shared documents with Attorney Plutzik, who represented claimants in the *Vazquez* arbitration.  Aside from the *Vazquez* arbitration, Reich declared Plutzik was one of the attorneys who considered representing Valdez in the qui tam action.  He also declared the other attorneys listed in the so-called dissemination chart were contacted to consider whether to represent Valdez in the qui tam action.  Plaintiffs do not dispute Reich's declaration.  Plaintiffs did not, for example, obtain a contrary declaration from Plutzik.

Reich also shared documents with attorney Perez, who represented defendants in the *Marini* action, a case filed by plaintiffs against a terminated medical provider in which the defendants filed counterclaims alleging improper contract termination and inappropriate claim denials.  Reich declared the documents he shared were related to both the qui tam action and the *Marini* action because both actions involved plaintiffs' retaliation against providers for providing expensive, but necessary, care and the failure to pay non-network providers for emergency services.  Reich thus contends he provided documents to Perez to prove up a common issue.  Plaintiffs dispute Reich's characterization of the *Marini* action, but even though they and their affiliates were the plaintiffs in the *Marini* action, they did not provide us with pleadings.  Moreover, they did not obtain a contrary declaration from Perez.

---

[14] The *Healthsmart* court did not analyze whether the statements were protected under section 425.16, subdivision (e)(2), choosing instead to analyze the case under the "catchall definition under subdivision (e)(4)." (*Healthsmart*, at p. 427, fn. 7.)

14

Plaintiffs concede all three matters — the qui tam action, the *Vazquez* arbitration, and the *Marini* action — involve medical services and billing, but nevertheless they contend the issues do not overlap. We are not persuaded.

In the qui tam action, Valdez alleged MMM is the largest of two Medicare plans owned by MMM's then parent company, serving 130,000 members in Puerto Rico. It also alleges in 2010, plaintiffs knew they were overcharging the government based on diagnosis codes that were not supported by medical records. And in the first amended complaint in the qui tam action, Valdez further alleged plaintiffs failed to pay doctors for emergency-related services and retaliated against providers for providing expensive medical care. In the *Vazquez* arbitration, claimants alleged that in 2010, the government adjusted the Medicare fee schedule for Puerto Rico resulting in substantial fees increase for Medicare providers, which fee increases were not passed on to the providers, resulting in the underpayment of tens of millions of dollars even though plaintiffs knew the sums were properly due.

The overall picture that emerges from the three actions is this: plaintiffs allegedly overbilled the government and underpaid their medical providers, a legal double whammy that, because it involves taxpayer funds, implicates a public issue or an issue of public interest. While there are some distinctions that demarcate each case, it is enough for our purposes that plaintiffs' litigation adversaries all contend plaintiffs' billing and payment practices were dubious. The documents acquired during Valdez's employment and later given over to his attorney, Reich, have at their core the intent of proving the double whammy allegations.

Plaintiffs contend litigation over the business relationships of doctors and hospitals and HMOs are not matters of public interest. We disagree to the extent plaintiffs are alleged to be engaged in widespread overbilling of Medicare and underpaying of Medicare providers.

15

"The definition of 'public interest' within the meaning of the anti-SLAPP statute has been broadly construed to include not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity." (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.) "Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 650, disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53 [citing product liability suits and real estate or investment scams as examples].) Here, plaintiffs are large, powerful organizations serving thousands of Puerto Ricans by providing access to government-paid Medicare.

We also note that to the extent plaintiffs stand firm that Reich's conduct was improper, they are not left without a remedy and have suffered no prejudice. (Cal. Const., art. VI, § 13.) The issue was placed before the district court in Puerto Rico. Plaintiffs insist Reich disseminated privileged communications, and Reich insists he did not. That issue is more appropriately dealt with by the Puerto Rico district court or by the tribunals hearing the *Marini* action and *Vasquez* arbitration, rather than in a tort action against Reich.

Reich has met his burden to show his conduct arose from protected activity. Accordingly, we now turn to plaintiffs' burden on prong two.

*Plaintiffs Have Not Demonstrated the Probability of Prevailing on Their Claims*

Under the second prong of the anti-SLAPP analysis, plaintiffs have the burden of establishing a probability of prevailing on their claims. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 733.) "Put another way, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient

16

prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

A plaintiff cannot establish a probability of prevailing if the litigation privilege precludes the defendant's liability on the claim. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 323.) The litigation privilege precludes liability arising from a publication or broadcast made in a judicial proceeding or other official proceeding. (See Civ. Code, § 47, subd. (b).) "'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.] The privilege 'is not limited to statements made during a trial or other proceedings, but may extend to steps taken prior thereto, or afterwards.'" (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241.) "The purposes of section 47, subdivision (b), are to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation. [Citation.] To effectuate these purposes, the litigation privilege is absolute and applies regardless of malice. [Citation.] Moreover, '[i]n furtherance of the public policy purposes it is designed to serve, the privilege prescribed by section 47[, subdivision (b)], has been given broad application." (*Rusheen, supra,* 37 Cal.4th at p. 1063.)

"Because the litigation privilege protects only publications and communications, a 'threshold issue in determining the applicability' of the privilege is whether the defendant's *conduct* was communicative or noncommunicative. [Citation.] The distinction between communicative and noncommunicative *conduct* hinges on the gravamen of the action. [Citations.] That is, the key in determining whether the privilege

17

applies is whether the injury allegedly resulted from an act that was communicative in its essential nature." (*Rusheen*, *supra*, 37 Cal.4th at p. 1058, italics added.)

The definition of the word "communicate" virtually describes the conduct here at issue. "Communicate" means "to convey knowledge of or information about." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 232.) Disseminating the documents to Plutzik and Perez communicated knowledge and information about plaintiffs' acts and thus was "communicative in its essential nature." (*Rusheen*, *supra*, 37 Cal.4th at p. 1058.)

But plaintiffs contend the litigation privilege does not insulate Reich from liability because: (1) the duty breached by Reich arises from a contract; (2) Reich's activities were unlawful; or (3) Reich owed plaintiffs an independent duty. We are not persuaded.

Plaintiffs argue that Valdez breached his contractual duty to return the documents upon his termination, but they have not cited any apt authority that would bind Reich to that alleged contractual duty, much less make the litigation privilege unavailable. Valdez is not a party to this case, and plaintiffs have not alleged breach of contract as a cause of action against Reich.

The argument Reich's activities were unlawful is also a nonstarter. California courts consistently hold that defendants may satisfy their burden to show that they were engaged in conduct in furtherance of their right of free speech under the anti-SLAPP statute, even when their conduct was allegedly unlawful. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 706-707, 713, [defendants' investigation, including an interview that was allegedly fraudulently obtained, constituted protected activity]; *Hall v. Time Warner, Inc*. (2007) 153 Cal.App.4th 1337, 1343 [same]; *Lieberman v. KCOP Television, Inc*. (2003) 110 Cal.App.4th 156, 165-166 [concluding defendants' newsgathering, including the use of surreptitious videotape recordings that were allegedly illegally obtained, constituted protected activity].)

18

To the extent a distinction can be made, plaintiffs also seem to argue Reich's conduct was criminal. They point out the alleged violation of Penal Code section 496, which provides in part, "Every person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen or obtained, or who conceals, sells, withholds, or aids in concealing, selling, or withholding any property from the owner, knowing the property to be so stolen or obtained, shall be punished by imprisonment in a county jail for not more than one year, or imprisonment pursuant to subdivision (h) of Section 1170." (Pen. Code, § 496, subd. (a).) Penal Code section 496, subdivision (c), authorizes a civil action for treble damages for violation of the statute.

Even if plaintiffs were correct that the litigation privilege does not apply to conduct proscribed by Penal Code section 496, plaintiffs have not established, as an evidentiary matter, that Reich's conduct was criminal in nature. Penal Code section 496 requires a showing that the property received was, in fact, stolen, i.e., that Valdez's conduct in retaining the documents satisfied each of the elements of at least one of the several varieties of theft offenses defined in Penal Code section 494, subdivision (a), and was not merely a breach of contract. (*People v. Moses* (1990) 217 Cal.App.3d 1245, 1250 [violation of Pen. Code, § 496, subd. (a) requires showing "(1) *that the particular property was stolen*, (2) that the accused received, concealed or withheld it from the owner thereof, and (3) that the accused knew that the property was stolen" (italics added)].) Thus, plaintiffs' burden was to make a prima facie showing of theft by Valdez. "'Theft . . . is the unlawful taking of another's property. [Citation.] The crime includes larceny, embezzlement, larceny by trick, and theft by false pretenses. [Citations]. Larceny, larceny by trick, and embezzlement involve taking another's personal property from the owner's possession, without the owner's consent, *with the intent to deprive the owner permanently of the property*. [Citations.] Theft by false pretenses does not require that the defendant take the property; it requires that the defendant use false pretenses to

19

induce the other to give the property to him.'" (*People v. Miller* (2000) 81 Cal.App.4th 1427, 1445-1446, italics added.) The evidence here does not support the specific intent element of a theft offense by Valdez, much less demonstrate that Reich had knowledge that the elements of a theft offense had been committed by Valdez. Plaintiffs have not produced *any* evidence that Valdez intended to do anything with the documents other than to use them in litigation. The limited purpose of Valdez's retention of the documents was made manifest when Reich delivered electronic copies of the documents to plaintiffs in October 2014, and electronic copies of Valdez's notes in October 2015.

Plaintiffs' evidence consists of four declarations and several exhibits. In the trial court, plaintiffs made *no effort* to recite the required elements of any cause of action pleaded in the complaint, and instead concluded with amorphous phrases such as "[t]he evidence of [i]mproper [u]se here is almost entirely undisputed." Plaintiffs emphasized their contention Reich shared privileged documents that violated "the duties in question." Plaintiffs cited at length from the *unverified* complaint, allegations that cannot be used to make the required showing on prong two. (*Contreras v. Dowling*, *supra*, 5 Cal.App.5th at p. 405.) While plaintiffs also *cited* to their declarations submitted in opposition to Reich's motion, they did not analyze the declarants' statements, or their exhibits, nor did plaintiffs tie the evidence to any element of any cause of action alleged in their complaint. We regard this as a requirement for an anti-SLAPP motion which involves a "summary-judgment-like procedure." (*Baral v. Schnitt, supra,* 1 Cal.5th at p. 384 ["We have described this second step as a 'summary-judgment-like procedure.'"].)

Finally, we are at a loss to understand the argument that Reich owed plaintiffs — his client's adversaries — any legally recognizable duty. Perhaps most importantly, plaintiffs do not allege negligence or breach of any duty in their complaint. Plaintiffs' reliance on *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153 is misplaced. There, the court held the litigation privilege was inapplicable in an action by a *former client* against its attorney for breach of professional duties. (*Id.* at p.

20

1174.)  The case is factually distinguishable, because here plaintiffs are not Reich's former clients.  Similarly, the other cases cited by plaintiffs do not establish an independent duty owed to plaintiffs by their adversary's attorney.  (See *Kolar v. Donahue, McIntosh & Hammerton* (2006) 145 Cal.App.4th 1532 [former client suing attorney for legal malpractice]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1992) 5 Cal.App.4th 392 [company and individuals suing accounting firm they used as expert witnesses]; *Optional Capital, Inc. v. DAS Corp.* (2014) 222 Cal.App.4th 1388 [corporation suing fiduciaries]; *Oasis West Realty LLC v. Goldman* (2011) 51 Cal.4th 811 [former client suing attorney for breach of fiduciary duty, professional negligence, and breach of contract].)

Plaintiffs also suggest Civil Code section 1714.10, entitled "Attorney client civil conspiracy; proof and court determination prior to pleading; defense; limitations; appeal," has some application.  We disagree.  The statute requires a litigant to obtain court approval to file a complaint containing conspiracy allegations between an attorney and his or her client.  (Civ. Code, § 1714.10, subd. (a).)  The purpose of the statute is to "discourage frivolous claims that an attorney conspired with his or her client to harm another.  Therefore, rather than requiring the attorney to defeat the claim by showing it is legally meritless, the plaintiff must make a prima facie showing before being allowed to assert the claim."  (*Klotz v. Milbank, Tweed, Hadley & McCloy* (2015) 238 Cal.App.4th 1339, 1350.)  There is no inkling anywhere in the record on appeal suggesting plaintiffs attempted to obtain a pre-filing order necessary to state a claim for conspiracy against Reich.

All the conduct alleged against Reich is protected by the litigation privilege, or, alternatively, with respect to the civil receiving stolen property cause of action, unsupported by a prima facie evidentiary showing.  We have already determined all five causes of action arise from Reich's use of the documents he received from Valdez in connection with the qui tam action Reich filed.  Reich's conduct in sharing documents

21

with Plutzik and Perez is also protected because both Plutzik and Perez were involved in litigation — the qui tam action, the Vazquez arbitration, and the Marini action. The documents were "reasonably relevant" to pending or contemplated litigation and thus protected by the litigation privilege. (See *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266.)

Having failed to demonstrate their complaint is legally sufficient and supported by a prima facie factual showing, plaintiffs have not established the probability of prevailing on their claims. Therefore, they did not meet their burden on prong two of the anti-SLAPP analysis.

*Request for Judicial Notice*

Both parties request we take judicial notice of documents attached as exhibits to motions filed in an action pending in Puerto Rico and of the ruling on plaintiffs' motion in the qui tam action for return of the subject documents.[15] These documents were not before the trial court, so the requests are denied. "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' [Citation.] This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .' [Citation.] The rule promotes the orderly settling of factual questions and disputes in the trial court, provides a meaningful record for review, and serves to avoid prolonged delays on appeal. 'Although appellate courts are authorized to make findings of fact on appeal . . . the authority should be exercised sparingly. [Citation.] *Absent exceptional circumstances,*

---

[15] The motions are in Spanish, but the attachments are in English.

22

*no such findings should be made*.'"  (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.)  No exceptional circumstances exist here.

DISPOSITION

The order is affirmed.  Reich shall recover his costs on appeal.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.