Filed 7/9/24  Both v. Liolios CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RONALD ANDREW BOTH,<br><br>    Plaintiff, Cross-defendant, Cross-complainant and Respondent,<br><br>    v.<br><br>JEFFREY SCOTT LIOLIOS,<br><br>    Defendant, Cross-defendant and Appellant;<br><br>GEOFFREY PLANK,<br><br>    Cross-defendant, Cross-complainant and Respondent;<br><br>GRANT STUDE,<br><br>    Cross-defendant and Respondent; | B323935<br><br>(Los Angeles County Super. Ct. No. BC676901) |

CAPITAL MARKET ACCESS, LLC,

    Cross-defendant and
    Respondent.

APPEALS from a judgment and an order of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge. Judgment affirmed in part and reversed in part; order affirmed.

Snell & Wilmer, Michael B. Reynolds, Jeffrey M. Singletary and Jing (Jenny) Hua for Defendant, Cross-defendant and Appellant Jeffrey Scott Liolios and Defendant, Cross-complainant, Cross-defendant and Appellant, Liolios Group, Incorporated.

Law Office of Mark Mazda and Mark Mazda for Plaintiff, Cross-defendant, Cross-complainant and Respondent Ronald Andrew Both; Cross-defendant, Cross-complainant and Respondent Geoffrey Plank; Cross-defendant and Respondent Grant Stude; and Cross-defendant and Respondent Capital Market Access, LLC.

_____

This is an appeal from a judgment following a jury award of compensatory damages, waiting-time penalties, and punitive damages to respondent Ronald Andrew Both and against appellants Jeffrey Scott Liolios and Liolios Group, Incorporated.[1] The judgment was also in favor of respondents Both, Geoffrey

_____

[1] We hereafter refer to Liolios Group, Incorporated individually as "LGI," and we refer to Liolios and LGI collectively as "appellants."

2

Plank, Grant Stude, and Capital Market Access, LLC[2] in accordance with the trial court's order granting respondents' motion for a directed verdict on LGI's cross-claims against them. Additionally, appellants seek review of the trial court's order denying their motion for judgment notwithstanding the verdict. Although we affirm the order denying appellants' motion, we reverse in part and affirm in part the judgment and remand for further proceedings.

First, appellants fail to demonstrate the trial court erred in granting a directed verdict in favor of Both, Plank, and CMA on LGI's cross-claims for breach of contract, misappropriation of trade secrets, intentional interference with contract, and intentional interference with prospective economic advantage either because appellants fail to direct us to evidence supporting LGI's claims or appellants forfeited their contentions by not raising them below.

Second, appellants fail to show the trial court erred in rejecting their waiver defense to Both's recovery of unpaid wages and waiting-time penalties. Liolios repeatedly lied to Both when he claimed to have diverted Both's compensation to make capital contributions covering losses that LGI did not in fact incur. Given that appellants do not dispute this evidence of Liolios's fraud, Both's consent to the diversion of his compensation was not voluntary.

Third, appellants have forfeited their argument that portions of Both's damages award are time-barred because they do not contest the trial court's ruling that the continuing

---

[2] We employ "CMA" as an abbreviation for Capital Market Access, LLC, and we refer to Both, Plank, Stude, and CMA collectively as "respondents."

3

violation doctrine applied to Both's claims. It is appellants' burden to show error on appeal and they failed to show error as to the trial court's application of that doctrine.

Fourth, appellants do not show the trial court erred in ruling that because Liolios failed to comply with a trial subpoena for his tax returns, he was estopped from contesting the sufficiency of the evidence concerning his ability to pay the $2 million punitive damages award.

Lastly, we hold the $2 million punitive damages award against LGI is excessive because that figure constitutes approximately 71 percent of the value of LGI's equity.

In sum, we reverse the portion of the judgment that awards Both $2 million in punitive damages against LGI. We remand the matter for a new trial on the amount of punitive damages to be awarded against that entity. We affirm all other aspects of the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

We summarize only those facts pertinent to the instant appeals. In our Discussion, *post*, we describe additional facts relevant to the issues before us.

---

[3] In describing the procedural history and the evidence presented at trial or in connection with appellants' posttrial motions, we rely in part on undisputed aspects of the trial court's rulings, admissions made by the parties in their appellate briefing, and assertions respondents make that appellants do not contest in their reply. (See *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 349, fn. 2 [utilizing the summary of facts provided in the trial court's ruling]; Discussion, part B.1, *post* [noting that the trial court's rulings are presumed

Liolios founded LGI, which is an investor relations firm that advises companies on their capital markets communications strategy and on implementation of that strategy. Liolios has an 80 percent ownership stake in the company, and since 2002, Both has owned the remaining 20 percent of the company's equity. LGI charges its clients flat monthly fees, and certain clients also compensate LGI with stocks, options, and/or warrants.

Both worked for LGI from 2000 or 2001 until December 2016. Both managed certain clients for LGI during his tenure. Both testified that when he began his employment, he was paid a base salary along with a bonus that was tied to LGI's sale of stock and its exercise of stock options and warrants. Both testified LGI later changed his compensation package from a base salary and bonus to a 30 percent fee for LGI clients he directly managed and a 10 percent fee for the firm's other clients (the latter Both referred to as the 10 percent "override"). During the proceedings below, Both claimed that on several occasions, Liolios told Both he had to reduce Both's pay to help cover LGI's losses, even though, in fact, LGI never had any such losses. Both further contended below that from 2002 through the end of 2016, Liolios and LGI concealed from Both that LGI was profitable and that LGI had made distributions to Liolios.

___

correct]; *Artal v. Allen* (2003) 111 Cal.App.4th 273, 275, fn. 2 [" '[A] reviewing court may make use of statements [in briefs and argument] . . . as admissions against the party [advancing them].' "]; *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles* (2023) 94 Cal.App.5th 764, 773–774 (*Association for Los Angeles Deputy Sheriffs*) [concluding that the appellants "tacitly concede[d]" a point raised in the respondents' brief by "failing to dispute it in their reply"].)

LGI employed Plank from September 2005 to March 2016. Stude worked for LGI from July 2010 to December 2016.

In July 2015, during Plank's tenure at LGI, Plank incorporated CMA. Plank testified CMA is an investor relations firm that directly competes with LGI. Respondents claim CMA did not conduct any business until after Plank resigned from LGI. Plank testified that several weeks after his resignation from LGI, he started CMA's business operations.

In December 2016, Both and Stude began working for CMA. The following five clients thereafter left LGI and hired CMA: RGS Energy, Optimize RX, Global Water Resources, TSO3, and Global Self Storage. Liolios testified RGS Energy, Optimize RX, and Global Water Resources terminated their relationship with LGI within approximately one month of Both's resignation in December 2016, and Both's testimony indicates that all three of those former LGI clients hired CMA at around the same time they ceased retaining LGI. Both testified TSO3 became a CMA client approximately five months after he ended his employment with LGI, and Global Self Storage hired CMA in 2019.

Liolios's trial testimony indicates that upon expiration of the initial term of LGI's contract with each of its clients, the parties have an automatically renewing "month to month" contract, at which point the client must notify LGI prior to terminating the contract. On appeal, respondents represent, "For all five of the clients that left LGI and came to CMA, they all finished out their LGI contracts, fulfilled their contractual obligations, paid what they owed, and did not come on board as CMA clients prior to finishing out their contracts with LGI."

On September 21, 2017, Both commenced the instant action by filing a complaint against Liolios and LGI, alleging causes of action for breach of fiduciary duty, oppression of minority member, unjust enrichment, violation of Business and Professions Code section 17200 et seq., and accounting. LGI later filed a cross-complaint against Both, Plank, Stude, and CMA, averring claims for breach of contract, misappropriation of trade secrets, intentional interference with contract, and intentional interference with prospective economic advantage. Subsequently, Both, Plank, and Stude filed a cross-complaint against Liolios and LGI, setting forth claims for breach of contract, quantum meruit, unpaid wages in violation of Labor Code sections 200 and 201, waiting-time penalties pursuant to Labor Code section 203, and violation of Business and Professions Code section 17200 et seq. Stude voluntarily dismissed his cross-claims before trial.

The case was tried before a jury in two phases: (1) liability on the parties' respective claims, the amount of actual damages and waiting-time penalties to be awarded against Liolios and LGI, and Liolios's and LGI's liability for punitive damages were tried in phase I; and (2) the amount of punitive damages to be awarded against Liolios and LGI was tried in phase II. At the conclusion of phase I of the trial, the trial court granted respondents' motion for a directed verdict on LGI's cross-complaint. The jury thereafter returned a special verdict (1) awarding Both $2,716,303.40 in actual damages on his causes of action for breach of fiduciary duty, intentional misrepresentation, concealment, and failure to pay wages, and $33,566.70 for waiting-time penalties; (2) awarding Plank $169,041.90 on his unpaid wages and waiting-time penalties claims; and (3) finding that LGI and Liolios acted with malice,

7

oppression, or fraud, thereby giving rise to liability for punitive damages.  Regarding the award of $2,716,303.40 in actual damages to Both, the jury found that $1,009,279.40 was attributable to damages Both "suffered as a result of . . . Liolios's breach of fiduciary duty," and that $1,707,024 constituted the amount of unpaid wages owed to Both.  The jury also found that Both suffered $2,716,303.40 in damages on his intentional misrepresentation and concealment claims, thereby indicating that the damages on those two causes of action was the sum of the damages on Both's breach of fiduciary duty and unpaid wage claims.

At the end of phase II, the jury returned a special verdict finding Liolios and LGI liable for punitive damages in the amount of $2 million.

On July 6, 2022, in accordance with the jury's special verdicts and the trial court's ruling on respondents' motion for a directed verdict, the court entered judgment:  (1) awarding Both $4,749,870.10 against LGI and Liolios, jointly and severally, which figure includes the $2 million award of punitive damages; (2) awarding Plank $169,041.90 against LGI and Liolios, jointly and severally; and (3) in favor of Both, Plank, Stude, and CMA and against LGI on its cross-complaint.[4]

Appellants moved for a new trial and a judgment notwithstanding the verdict.  On September 8, 2022, the trial court denied appellants' motion for judgment notwithstanding

---

[4] On appeal, appellants do not contest the portion of the judgment that awarded damages to Plank.  They also do not challenge the judgment in favor of Stude on LGI's cross-complaint.  (Fn. 7, *post*.)

the verdict and denied in part their new trial motion.[5]  On September 29, 2022, the court denied the remainder of appellants' new trial motion.  On October 3, 2022, appellants appealed the judgment and the September 8, 2022 order denying their motion for judgment notwithstanding the verdict.[6]

---

[5]  We, sua sponte, take judicial notice of the trial court's September 8, 2022 minute order that denied appellants' motion for judgment notwithstanding the verdict and denied in part their new trial motion.  (Evid. Code, §§ 452, subd. (d), 459.)

[6]  In their notice of appeal, appellants also sought review of the trial court's orders denying their new trial motion.  Although a party " 'may appeal from the judgment [and] from the order denying the motion for judgment notwithstanding the verdict' " (see *Brown v. City of Sacramento* (2019) 37 Cal.App.5th 587, 598), "[a]n order denying a motion for new trial is not independently appealable, but may be reviewed on appeal from the underlying judgment" (*People v. Ashford University, LLC* (2024) 100 Cal.App.5th 485, 502, fn. 4).

Additionally, we note the appeals of the judgment and of the September 8, 2022 order denying the motion for judgment notwithstanding the verdict are timely because appellants filed their notice of appeal a mere 28 days after issuance of the latter ruling.  (See Cal. Rules of Court, rule 8.108(d)(1) ["If any party serves and files a valid motion for judgment notwithstanding the verdict and the motion is denied, the time to appeal from the judgment is extended for all parties until the earliest of:  [¶] (A) 30 days after the superior court clerk or a party serves an order denying the motion or a notice of entry of that order; [¶] (B) 30 days after denial of the motion by operation of law; [¶] or (C) 180 days after entry of judgment."]; *id.*, rule 8.104(a)(1) & (e) [providing that an appealable order must be appealed within 60 days of service or 180 days of entry of the order, whichever is earlier].)

## DISCUSSION

### A. We Exercise Our Discretion To Reach the Merits of These Appeals Notwithstanding Respondents' Claim Appellants Waived Their Right To Appeal by Making Misrepresentations, Misstatements, and Omissions of Relevant Facts in Their Briefing

Respondents request we "find Appellants' entire appeal waived" because "Appellants [allegedly] make numerous misstatements, misrepresentations, and omissions of relevant facts" in their briefing.

Respondents rely upon decisions holding that an appellant may waive an insufficiency-of-the-evidence claim by ignoring evidence unfavorable to the appellant's position. (See *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 ["Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived.' "]; *Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["[A]ppellants who challenge the decision of the trial court based upon the absence of substantial evidence to support it ' "are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence.* Unless this is done the error is deemed waived." ' "]; *Brockey v. Moore* (2003) 107 Cal.App.4th 86, 96 ["Failure to set forth the material evidence on an issue waives a claim of insufficiency of the evidence."].)

These cases are not apt. First, to prevail on their challenge to the directed verdict, appellants are not required to show the absence of substantial evidence supporting that ruling. Rather, reversal is proper if appellants have shown that, upon considering the evidence *in the light most favorable to appellants*,

10

a reasonable jury could have rendered a verdict *in appellants' favor*. (See Discussion, part B.1, *post* [discussing the applicable standard of review].) Respondents have not directed us to any authority that the alleged misstatements, misrepresentations, or omissions give rise to a waiver of appellants' challenge to the directed verdict.

Aside from respondents' allegations vis-à-vis appellants' briefing on the directed verdict, respondents identify the following purported misrepresentations, misstatements, and omissions, none of which bears on our resolution of this appeal: (1) appellants falsely claim that Both's economic expert "did not have a basis to state that Liolios made $5 million off the Aspen Bio warrants," (2) appellants "attempt to mislead this Court into thinking" the trial court did not order "LGI to respond to interrogatories . . . ask[ing] for Liolios's and his wife's annual LGI salary from 2002–2021," and (3) appellants fail to disclose certain material facts relating to Liolios's bankruptcy.

An appellate court ordinarily has the discretion to excuse an appellant's waiver. (See *In re J.R.* (2022) 82 Cal.App.5th 569, 587, fn. 23.) Indeed, by arguing that we "can" and "should" find appellants' arguments to be waived, respondents tacitly acknowledge that our authority to do so is discretionary. Because none of the purported misstatements, misrepresentations, and omissions identified in the immediately preceding paragraph has any bearing on our resolution of this appeal, we exercise our discretion to reach the merits. (See Discussion, part C, *post* [resolving appellants' waiver issue without reference to appellants' alleged misstatements, misrepresentations, and omissions]; Discussion, part D, *post* [same for appellants' argument that certain claims are time-barred]; Discussion,

11

part E, *post* [declining to consider allegations concerning Liolios's bankruptcy and the order compelling further responses to interrogatories; the Aspen Bio warrants are not discussed therein]; Discussion, part F, *post* [affirming the order denying appellants' motion for judgment notwithstanding the verdict without addressing the issues delineated in the immediately preceding paragraph].) We express no opinion on the merits of respondents' claims of misstatements, misrepresentations, or omissions in appellants' briefing.

## B. The Trial Court Did Not Err In Granting a Directed Verdict on LGI's Cross-Claims

### 1. *Legal standards governing directed verdicts*

" '[A] motion for a directed verdict is in the nature of a demurrer to the evidence. [Citations.] In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. It may not grant a directed verdict where there is *any* substantial conflict in the evidence. [Citation.] A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party.' [Citation.]" (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 509 (*Los Angeles Unified School Dist.*).)

12

"A directed verdict is subject to de novo appellate review" (*Los Angeles Unified Sch. Dist.*, *supra*, 57 Cal.App.5th at p. 509), meaning "we will reverse if there was substantial evidence tending to prove appellants' case and the state of the law supports the claim." (See *North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902, 920.) Even when our review on appeal is de novo, however, " 'it is limited to issues which have been adequately raised and supported in [the appellant's opening] brief[,]' " given that " ' "[t]he most fundamental rule of appellate review is that an appealed judgment or order is presumed to be correct." [Citation.] . . . .' [Citation.]" (See *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 554–555 (*Golden Door Properties, LLC*).) To overcome the presumption of correctness, an appellant must " ' " 'supply[ ] the reviewing court with some cogent argument supported by legal analysis and citation to the record.' " [Citation.]' [Citations.]" (*Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at p. 777.)

>    2.    *LGI's cross-complaint, the confidentiality agreements, principles of trade secret law, and the trial court's ruling on the directed verdict motion*

In its cross-complaint, LGI alleged a breach of contract claim against Both and Plank based upon certain confidentiality agreements they executed with LGI, along with claims for misappropriation of trade secrets, intentional interference with

13

contract, and intentional interference with prospective economic advantage against Both, Plank, and CMA.[7]

The parties agree that Both's and Plank's confidentiality agreements with LGI do not materially differ. Those agreements provide: "During and after the Employment, [Both and Plank] will not use, disclose or otherwise permit any person or entity access to any of the Confidential Information other than as required in the performance of [Both's and Plank's] duties with [LGI,]" and that Both and Plank are "not allowed to sell, license or otherwise exploit any products or services (including software in any form) which embody in whole or in part any of the Confidential Information." "Confidential Information" is "information and materials [that] . . . are proprietary to [LGI] and . . . highly sensitive in nature." Encompassed within the definition of "Confidential Information" are, inter alia: "Customer, Contact, client and marketing information and materials, including, but not limited to, . . . customer, contact and client data, including customer, contact and client lists, names of customers, contacts and clients and their representatives, data provided by or about prospective, existing or past customers, contacts and clients, customer, contact and client service materials, . . . and . . . financial data, including price and cost objectives, price lists, pricing policies and procedures, and quoting policies and procedures." On the other hand, the agreements provide, "The general skills and experience gained by [Both and Plank] during the[ir] Employment, and information

---

[7] Although LGI leveled all four causes of action against Stude as well, LGI does not challenge the trial court's order granting Stude's motion for a directed verdict as to all cross-claims against him.

14

publicly available or generally known within the industries or trades in which [LGI] competes, is [*sic*] not considered a part of the Confidential Information."

"[M]isappropriation of a trade secret under the California U[niform Trade Secrets Act] consists of only two elements: (1) existence of a trade secret, and (2) improper acquisition, use, or disclosure of that trade secret." (*Applied Medical Distribution Corp. v. Jarrells* (2024) 100 Cal.App.5th 556, 568–570.) "A 'trade secret' is 'information, including a formula, pattern, compilation, program, device, method, technique, or process that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy[,]' " e.g., a confidentiality agreement. (See *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1452.) In turn, a defendant's use of a trade secret that he or she "[a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use" satisfies the second element of trade secret misappropriation. (See Civ. Code, § 3426.1, subd. (b)(2)(B)(ii) [defining misappropriation].)

In their opening brief, appellants describe what they claim to have been the trial court's reasoning in directing a verdict on LGI's cross-claims: "(1) there was no confidential information and (2) there was no trade secret." Appellants argue the court did not decide whether there was substantial evidence showing Both and Plank used LGI's confidential information or misappropriated its trade secrets. Appellants misinterpret the record.

15

In addressing the motion for a directed verdict on LGI's breach of contract cross-claim, the trial court remarked that appellants' counsel had not "compared" the manner in which LGI structures its transactions (e.g., LGI's tying its compensation to certain "performance metrics") "to anything" CMA "ha[d] done," and stated that "no evidence was presented that CMA does that same type of thing." The court further indicated that much of its analysis concerning whether Both and Plank breached their confidentiality agreements with LGI "merge[d] with" the court's assessment of LGI's misappropriation of trade secrets cross-claim. In addressing LGI's trade secret claim, the court stated, "I really don't know what was used." The court further elaborated, "[Appellants] failed to isolate [the trade secret] during the case. It's been very amorph[o]us out there." The trial court's remarks thus demonstrate it had ruled that the contract and trade secret cross-claims failed because LGI had not shown Both, Plank, and CMA had used any of LGI's confidential information and trade secrets.[8] (See *Concerned Citizens Coalition of Stockton v. City of Stockton* (2005) 128 Cal.App.4th 70, 77 [" 'The true measure of an order . . . is not an isolated phrase appearing therein, but its effect when considered as a whole.' "].)

Additionally, based on its decision to enter a directed verdict on LGI's breach of contract and trade secret cross-claims, the court ruled LGI failed to show Both, Plank, and CMA engaged in an independently wrongful act, which is a necessary element of claims for intentional interference with an at-will

[8] The trial court indicated it had treated CMA's liability on LGI's cross-claims as being premised solely on Both's and Plank's conduct. On appeal, appellants do not argue that CMA's liability is predicated on the misconduct of other CMA personnel.

16

contract and intentional interference with prospective economic advantage. (See *Ixchel Pharma, LLC v. Biogen, Inc.* (2020) 9 Cal.5th 1130, 1142 ["[I]ntentionally interfering with prospective economic advantage requires pleading that the defendant committed an independently wrongful act [citation]. '[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard.' "]; *id.* at p. 1148 ["[T]o state a claim for interference with an at-will contract by a third party, the plaintiff must allege that the defendant engaged in an independently wrongful act."].)

We next turn to whether the trial court erred in granting a directed verdict based on LGI's failure to introduce substantial evidence that Both, Plank, and CMA had used LGI's confidential information and trade secrets.

> 3. *Appellants failed to preserve for appeal several of their challenges to the directed verdict and they otherwise fail to demonstrate there is substantial evidence that Both and Plank used LGI's confidential information and trade secrets*

In their opening brief, appellants seem to argue that the following constitute (1) LGI trade secrets and (2) "Confidential Information" for the purpose of Both's and Plank's confidentiality agreements: "LGI's customer and client lists"; "contact information . . . for clients[ and] for potential investors[,] . . . investors' preferences, their other investments, . . . whether each had met with certain other clients," and "personal information on the investors"; "LGI's methodology in structuring prices" (e.g., utilizing "certain performance metrics, such as coverage in media outlets, trade volume, or stock price"); and LGI's "exact pricing

17

information *per client*." Appellants further argue, "Even if [Both and Plank] had not breached any agreement or misappropriated any trade secrets, the act of competing [with LGI while still employed by that entity] breaches their common law duty of loyalty to LGI," meaning we should "reverse as to the interference claims" "even if [we] do[ ] not reverse the directed verdict" on the other two cross-claims.[9]

Appellants do not claim to have presented any evidence at trial that Both or Plank had utilized any investor information belonging to LGI. Further, although appellants assert "Both and Plank accessed *and used* Confidential Information that included how LGI developed its clients and structured its pricing" (italics added), the record citation they provide to support that proposition shows only that Plank admitted he continued to have

---

[9] Appellants also contend that in denying respondents' summary adjudication motion, the trial court "noted that Both had admitted to having and using LGI's confidential customer contact information to contact LGI's clients to convince them to hire CMA and that there was 'a clear triable issue of material fact as to whether or not Both relied on LGI's confidential pricing information to attract new clients.' [Citation.]" Appellants do not claim this evidence referenced in the summary adjudication order was introduced at trial or otherwise explain what bearing this aspect of the court's pretrial ruling should have on our review of the order granting a directed verdict on LGI's cross-complaint. Accordingly, we decline to address this argument further. (See *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand Corp.*) ["We may and do 'disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt.' "].)

*access* to LGI's database containing client information after he formed CMA. Appellants thus fail to demonstrate there was substantial evidence that Both and Plank *used* LGI's investor information or the company's pricing structure.

Regarding LGI's client list and contact information, appellants argue, "Plank conceded at trial that he had LGI client information on his electronic devices when he left LGI and used that information to contact LGI's clients." Although appellants acknowledge respondents offered evidence that "the identities of some LGI clients were public [and] that their contact information could be found through online searches or through 'data aggregators[,]' " appellants do not argue Plank had contacted any LGI clients whose identities and contact information were not publicly available. In fact, appellants do not even identify which LGI clients Plank contacted using information on his electronic devices after he left LGI. Because " ' "all intendments and presumptions are indulged in favor of [the] correctness" ' " of the trial court's ruling even on de novo review (see *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at pp. 776–777), appellants' intimation that Plank may have utilized nonpublic information to make entreaties to LGI's clients falls short of demonstrating error.

Concerning LGI's "exact pricing information *per client*," appellants maintain there was substantial evidence Both breached his confidentiality agreement by deploying his knowledge of the rates LGI charged TSO3, Optimize RX, and RGS Energy to persuade them to hire CMA. Specifically, appellants argue CMA charged TSO3 a monthly rate that was $600 less than the rate TSO3 had previously owed to LGI; CMA charged Optimize RX a monthly rate $100 less than the rate

19

Optimize RX had previously owed to LGI; and "[a] week after Both left LGI, Plank 'ghostwrote' an email for Both to send [RGS Energy], which was then an LGI client, offering [CMA's] services at the same rate charged by LGI."[10] Appellants claim this alleged breach of Both's confidentiality agreement also "supports a finding that Respondents misappropriated LGI's trade secrets."

Furthermore, appellants seem to support their argument that Both and Plank breached their duty of loyalty to LGI with the assertion that "a jury could reasonably infer [Both and Plank] . . . were not credible in testifying they did not do any work for CMA until after they left LGI." For instance, appellants claim, "Plank sent emails to clients referencing Both as a 'silent partner' months before Both left LGI."

Respondents counter that appellants failed to raise below, and thereby waived or forfeited, their arguments that (1) Both's knowledge of "what LGI charged clients that followed him to CMA . . . is evidence that he breached" the confidentiality agreement, and (2) "Both/Plank breached a duty of loyalty by competing against LGI while they still worked for LGI." In their reply, appellants do not dispute that they failed to make these arguments during the trial court proceedings. Instead, they contend that raising these arguments "would have been futile upon the [trial] court's finding there were no trade secrets to misappropriate and no confidential information to use."

We disagree. As we explained in Discussion, part B.2, *ante*, the court analyzed whether there was evidence Both and Plank

---

**10** Appellants do not clarify whether they are asserting that CMA ultimately charged RGS Energy the same rate as LGI had done. In any event, this ambiguity has no impact on our resolution of the instant appeals.

20

used LGI's confidential information or trade secrets.  Had appellants raised the argument that Both used his knowledge of the rates LGI charged TSO3, Optimize RX, and RGS Energy to persuade those clients to hire CMA, the trial court could have considered that contention as the court was searching in its analysis for a trade secret or otherwise confidential information Both and Plank had used.  In addition, even if one accepted appellants' futility premise, that premise would not apply to their new breach of duty of loyalty theory because, as they acknowledge, that theory would not have required appellants to show Both and Plank had "breached any agreement or misappropriated any trade secrets . . . ."  In sum, because advancing these two arguments below would not have been an exercise in futility, appellants forfeited these contentions by raising them for the first time on appeal.  (See *Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 698 (*Meridian Financial Services, Inc.*) [" 'Ordinarily the failure to preserve a point below constitutes a [forfeiture] of the point.' "]; *id.* at p. 700 ["We 'are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider.' "].)

## C.  Appellants Fail To Establish the Trial Court Erred In Rejecting Their Waiver Defense as to Both's Claims for Unpaid Wages and Waiting-Time Penalties

Appellants argue we should strike "[t]he jury's award of $1,707,024 as to Both's claim for unpaid wages and $33,566.70 in waiting-time penalties" because "undisputed evidence" "establishes that [Both] waived his right to pursue unpaid wages" by "continu[ing] to work for LGI" upon being "given notice of the changes to his wages."  In particular, appellants assert Both

21

admitted he "knew about his reduced compensation in 2007 and 2011[11] and that Liolios informed Both in May of 2014" that "LGI would be reducing . . . Both's compensation from gross billings to clients he did not manage" to wit, the "10% override." They further contend that "because an employer in an at-will relationship has the right to unilaterally terminate an employee, that employer inherently retains the right to reduce compensation." In addition, appellants claim their waiver defense applies to the waiting-time penalties Both recovered because they "are derivative of Both's claims for unpaid wages."

The trial court rejected appellants' waiver theory in the court's September 8, 2022 ruling on their posttrial motions. The court explained, "Both submitted evidence at trial that . . . 'whenever Liolios told Both that he was cutting his pay, he told Both the reason for it was because Both was a shareholder of LGI, LGI had losses, and Both, as an LGI 20% shareholder, needed to contribute his share of capital contributions to cover those losses.' " The court also noted the evidence showed " 'LGI never had losses.' " Because appellants "did not submit any caselaw wherein a modified employment contract was found to be enforceable where the employee accepted new conditions based on fraudulent misrepresentations[,] . . . the Court [was] not

---

[11] Appellants appear to be referring to the following testimony Both provided at trial, which was summarized by the trial court in its September 8, 2022 minute order: "Both testified that he was aware when his wages were allegedly cut back, including in 2007 when he received 20% rather than 30% of the income from the sale of Aspen Bio Pharma warrants [citation], and in 2011 when he received 20% rather than 30% of the profits on an option exercise involving Que Pasa."

22

persuaded that Both was barred from claiming unpaid wages and waiting time-penalties as a matter of law."

Appellants bear the burden of overcoming the presumption of correctness of the trial court's posttrial order disposing of appellants' waiver defense.[12]  Appellants do not contest the trial court's characterization of the trial evidence concerning Liolios's fraudulent misrepresentations.  Instead, they insist, "There is nothing in the case law requiring the employee to know the *reason* for the reduced salary," and that the employee "simply [needs to be aware of] the 'terms and conditions' of the new employment agreement."  Appellants thus seem to contend that because Liolios purportedly had no obligation to inform Both of the reasons LGI needed to reduce his pay, the fact he lied to Both concerning the justifications for those reductions is of no consequence.  We assess this claim of error de novo.  (See *Lynch v. California Costal Com.* (2017) 3 Cal.5th 470, 476 [" ' "When . . . the facts are undisputed and only one inference may reasonably be drawn, the issue [of waiver] is one of law and the reviewing court is not bound by the trial court's ruling." ' "].)

Appellants' argument misses the mark.  Appellants' waiver defense does not turn on whether an employer is obligated to notify an employee of the justification for the reduced pay.  Here, Liolios falsely represented to Both that his wages were being diverted to LGI to make capital contributions covering losses that LGI did not actually incur.  We also note that at oral argument, appellants' counsel conceded there is no evidence in the record

---

[12] (See *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at pp. 776–777 [" ' "A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness." ' "].)

that the reductions in Both's wages were even credited toward his LGI shareholder capital account.  (See *Consumer Cause, Inc. v. SmileCare* (2001) 91 Cal.App.4th 454, 475 [noting that "counsel's concessions and admissions at oral argument are binding"].)  Indeed, the jury awarded Both wages as damages on his claims of intentional misrepresentation and concealment against Liolios and LGI.  (See Factual & Procedural Background, *ante*.)

Under these circumstances, Liolios's fraud vitiated the voluntariness of Both's consent to forgo certain wages, thereby precluding a finding of waiver on his part.  (See *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 257 ["Waiver is 'the *voluntary* relinquishment of a known right,' " italics added]; cf. 3 Cal. Affirmative Def. (2d ed. 2023) § 47:8 & fn. 7 ["A waiver of [a contractual right to] notice that is the product of fraud is ineffective to harm the rights of the defrauded person. . . . This result is implicit in the requirement that waiver be intentional and voluntary."].)  Accordingly, appellants' waiver defense fails.

## D. Appellants Forfeited Their Contention That Portions of Both's Damages Award Are Time-Barred

Appellants maintain that "significant portions of Both's compensatory and statutory damages are barred by the statute of limitations."  (Boldface & some capitalization omitted.)  They argue, "Both was not entitled to recover damages based on actions that occurred before September 21, 2013, for his fiduciary duty claim, September 21, 2014, for his intentional misrepresentation claim and unpaid wages claim, and September 21, 2015, for his claim for negligent misrepresentation and concealment."  Appellants further contend that, in order to

24

reflect the time-barred aspects of Both's claims, "the compensatory award in favor of Both should be reduced from $2,716,303.40 to $814,623.80," which they assert "reflects a reduction of the damages for breach of fiduciary duty from $1,009,279.40 to $203,645.80, . . . and a reduction of the damages for unpaid wages from $1,707,024 to $610,978 . . . ."

In its September 8, 2022 order, the trial court rejected appellants' argument that portions of Both's claims for relief are time-barred. The court found, "Under the continuing-violation doctrine, a plaintiff can recover not only for actions that took place during the statute of limitations period, but also for misconduct that occurred outside the period provided it is 'sufficiently linked' to the conduct within the limitations period." (Quoting *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812.) The court further stated, "Here, a jury could have reasonably concluded that Both was entitled to claim all of his compensatory damages based on Both's evidence that throughout the entirety of his employment at LGI, 'Liolios and LGI affirmatively and continuously lied to Both that LGI had no profits and made no distributions, when it always was profitable and made distributions to Liolios; concealed from Both that Liolios was taking distributions; lied to Both that Liolios had not taken any distributions; concealed from Both that Liolios was paying his wife . . . $1,538,942 in phantom distributions to Liolios; told Both that he was cutting Both's pay because LGI had losses, which it did not, and Both, as a shareholder of LGI, needed to contribute his share of capital contributions to cover these losses via this cut in Both's wages, when LGI never needed any such capital contributions.' "

25

Appellants' briefing does not address the continuing violation doctrine at all, let alone argue the trial court erred in applying it here. Rather, appellants contend the delayed discovery rule and the fraudulent concealment doctrine do not salvage Both's claims. The continuing violation doctrine, however, is distinct from the delayed discovery rule and the fraudulent concealment doctrine. (See *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1192 [indicating that all three are among the various "equitable exceptions to and modifications of the usual rules governing limitations periods"].)

"It is not this court's role to construct arguments that would undermine the lower court's judgment and defeat the presumption of correctness. Rather, an appellant is required to present a cognizable legal argument in support of reversal of the judgment and when the appellant fails to support an issue with pertinent or cognizable argument, 'it may be deemed abandoned and discussion by the reviewing court is unnecessary.' [Citation.] Issues not supported by argument or citation to authority are forfeited." (*Needelman v. DeWolf Realty Co., Inc.* (2015) 239 Cal.App.4th 750, 762.) In accordance with these fundamental appellate principles, we conclude appellants have forfeited their statute-of-limitations argument by failing to rebut the presumption of correctness of the trial court's reliance on the continuing violation doctrine.

We also agree with respondents that appellants fail to articulate cogently the evidentiary basis for their assertion that if they prevail on their statute-of-limitations argument, then Both's recovery on his breach of fiduciary duty claim should be reduced to "$203,645.80, which represents 20% of LGI's distributions from September 21, 2013, to the present . . . ." Appellants' first record

citation in support of this assertion refers to a one-page excerpt of a document that the index to the appellants' appendix identifies as "Trial Exhibit 410: MGO Analysis of Schedule 1 Summary of Damages." This record excerpt does not refer explicitly to "LGI's distributions from September 21, 2013, to the present," and appellants do not explain why we should infer from that document that $203,645.80 corresponds to 20 percent of LGI's distributions during that period. Appellants' other two record citations correspond to excerpts of the judgment that do not disclose LGI's distributions from September 21, 2013 to the present. For this additional and independent reason, we conclude appellants have forfeited their request to modify the award of damages on Both's breach of fiduciary duty claim. (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 153.)

## E. We Affirm on Estoppel Grounds the Award of Punitive Damages as to Liolios But We Reverse the Award as to LGI as Excessive

### 1. *We do not consider evidence concerning Liolios's bankruptcy*

As a preliminary matter, we address the parties' request we consider evidence relating to Liolios's bankruptcy. Several days after the trial court denied appellants' new trial motion on September 29, 2022, Liolios filed a voluntary petition for chapter 11 bankruptcy.[13] On appeal, each side relies upon filings

---

[13] Although we initially stayed this appeal because of the pending bankruptcy proceedings, we later allowed the appeal to proceed after respondents' counsel informed us that the bankruptcy court had granted relief from the automatic bankruptcy stay.

27

from the bankruptcy proceedings. For instance, appellants argue the award of punitive damages against Liolios was excessive because "it immediately plunged [him] into bankruptcy." Conversely, respondents argue, "Liolios's bankruptcy supports affirming" the award of punitive damages because, inter alia, "Liolios submitted a reorganization plan" showing Liolios is capable of "pay[ing] the entirety of the judgment over 5 years . . . ." (Boldface & some capitalization omitted from first quotation; italics omitted from third quotation.)

" 'It has long been the general rule and understanding that "an appeal reviews the correctness of a judgment *as of the time of its rendition, upon a record of matters which were before the trial court for its consideration*." [Citation.] This rule reflects an "essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . ." [Citation.]' . . . [Citation.]" (*MMM Holdings, Inc. v. Reich* (2018) 21 Cal.App.5th 167, 187 (*MMM Holdings, Inc.*), italics added.) We acknowledge that notwithstanding this general rule, there are "exceptional circumstances" under which we may make factual findings on appeal. (See *ibid.*, italics omitted.)

Appellants do not argue this case warrants a departure from the general rule. Nor do they claim that during the trial court proceedings, Liolios was unable to present evidence that the punitive damages award would deplete his assets such that he could not pay his debts or the award would otherwise force him into bankruptcy. Respondents argue in a conclusory fashion that considering the bankruptcy filings would not "usurp the trial

28

court's fact-finding" and would "lead to a prompt determination[ and] avoid repetitive litigation . . . ."

Because the parties have not demonstrated there exist "exceptional circumstances" rendering it appropriate for us to make factual findings in the first instance (see *MMM Holdings, Inc.*, *supra*, 21 Cal.App.5th at p. 187), we decline to consider evidence concerning Liolios's post-judgment bankruptcy proceedings.

2. *Liolios is estopped from challenging the sufficiency of the evidence supporting the award of punitive damages against him*

In its September 29, 2022 order, the trial court observed appellants had argued that "Both did not meet his burden to prove [Liolios's] net worth" because "evidence of assets and income, alone, is insufficient without evidence of corresponding expenses and liabilities." The court agreed with Both, however, that Liolios had "failed to comply with a trial subpoena" that sought his personal tax returns for "tax years 2003 to the present[ ] and all 1099s issued to . . . Liolios for tax years 2003 to the present." The court found that "although these tax returns show income, they also show liabilities," and it agreed with Both that the tax returns " 'could show debts the interest of which is being deducted and/or they could show losses.' " The court concluded that Liolios's failure to comply with the trial subpoena estopped him from contesting the sufficiency of the evidence of his ability to pay the punitive damage award.

Appellants argue the trial court's reliance on estoppel was error. In particular, appellants argue (1) the trial subpoena was untimely; (2) appellants moved to quash the subpoena, thereby excusing Liolios's compliance; (3) the tax returns Both sought

29

would not have provided sufficient information regarding his "assets, liabilities, net worth and financial condition"; and (4) because Both served the trial subpoena before Liolios's liability for punitive damages had been established, Civil Code section 3295, subdivision (c) barred him from obtaining evidence of Liolios's financial condition. Although appellants do not identify clearly the standard of review applicable to this claim of error, we conclude their appellate claim would fail even under a de novo standard.[14]

First, appellants cite Code of Civil Procedure section 1987, subdivision (c) for the proposition that Both should have served the trial subpoena "at least 20 days before the commencement of trial." (Italics omitted.) The 20-day deadline prescribed by this provision, however, does not apply to a trial subpoena. Rather, subdivision (c) governs a "notice specified in subdivision (b) . . . [that] include[s] a request that the party or person bring with him or her books, documents, electronically stored information, or other things." (See Code Civ. Proc., § 1987, subd. (c).) In turn, subdivision (b) governs a "written notice requesting the witness to attend before a court, or at a trial" that may be utilized in lieu of a subpoena. (See *id.*, subd. (b) [providing that "the service of a

---

[14] In their opening brief, appellants assert in a conclusory fashion: "Respondents also sought documents already requested, objected to, and that were not the subject of a motion to compel, among other things." Appellants also note in passing for the first time in their reply brief that they asserted in their motion to quash that "the tax returns were privileged." We do not address these arguments. (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 153; *Golden Door Properties, LLC*, *supra*, 50 Cal.App.5th at pp. 482, 518 [concluding that an appellant "forfeited [a] point" "[b]y not raising [it] in [the] opening brief"].)

subpoena upon any such witness is not required if" this written notice procedure is used].)  Subdivision (c) in turn provides that "[t]he procedure of this subdivision is alternative" to other procedures and that "no subpoena duces tecum shall be required."  (See *id.*, subd. (c).)  Appellants thus fail to show the trial subpoena was untimely.

Second, appellants contend Liolios was "not obligated to obey the trial subpoena" because they "moved to quash the trial subpoena on May 18, 2022 . . . ."  Appellants cite *Garcia v. Myllyla* (2019) 40 Cal.App.5th 990 (*Garcia*), for the proposition that the filing of this motion " 'excus[ed Liolios's] compliance unless the serving party file[d] a noticed motion with a showing of good cause.' "  (Quoting *Garcia*, at p. 997.)  Appellants further argue, "Respondents failed to bring such a motion," and that the trial court "never ruled on" appellants' motion to quash.

*Garcia* does not assist appellants.  There, the Court of Appeal analyzed a notice for production of documents authorized by Code of Civil Procedure section 1987, subdivision (c).  (See *Garcia, supra,* 40 Cal.App.5th at pp. 996–998, citing Code Civ. Proc., § 1987, subd. (c).)  That provision states that if "the party or person of whom the [written] request [provided under that subdivision] is made . . . serve[s] written objections to the request or any part thereof," then the party serving the written request must file a "noticed motion[,] . . . accompanied by a showing of good cause and of materiality of the items to the issues" in order to secure production of the items.  (See Code Civ. Proc., § 1987, subd. (c).)  As we explained above, Both's trial subpoena is not a written notice governed by this provision, meaning that Liolios's compliance was not excused by the mere service of objections.  Instead, the trial subpoena here was "equivalent to a court order"

31

"requiring the . . . production of documents at trial . . . ." (See *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1338 (*Corenbaum*).)

Admittedly, Code of Civil Procedure section 1987.1, subdivision (a) authorized appellants to move for "an order quashing the subpoena . . . ." (See Code Civ. Proc., § 1987.1, subd. (a).) Nevertheless, the record shows appellants failed to take the measures necessary to pursue that remedy.

Appellants ignore that at the final status conference held on May 18, 2022 at 1:30 p.m., "[t]he Court and counsel . . . confer[red] regarding [appellants'] recently submitted Motion to Quash, which [was] pending filing in the clerk's office," and that the court thereafter directed "[t]he clerk's office [to] file and accept the Motion."[15] The text adjacent to the caption on appellants' notice of motion to quash indicates they had noticed the motion to be heard at the May 18, 2022 final status conference at which the court had permitted them to file the motion. Further, the first textual paragraph of the notice indicates appellants contemplated having the trial court hear the motion "on May 18, 2022, at 1:30 p.m. [(i.e., the date and time of the final status conference at which the court permitted the motion to be filed)], . . . prior to the commencement of trial on

---

[15] We, sua sponte, take judicial notice of the minute order from the May 18, 2022 final status conference. (Evid. Code, §§ 452, subd. (d), 459.) The minute order indicates that after the trial court called the matter for the final status conference and addressed certain matters with counsel, the court continued the final status conference to May 20, 2022 because the court was in trial on another matter.

32

May 19, 2022,[16] or as soon thereafter as counsel may be heard . . . ." Appellants do not contest—and therefore tacitly agree with—respondents' assertion that aside from filing the motion, appellants took no further action to obtain a ruling, for example, by reserving a specific date for the motion to be heard after the court permitted its filing.[17]

It thus appears appellants blame the trial court for failing, sua sponte, to set a hearing and briefing schedule on their motion to quash.[18] In our adversarial system, the onus was on appellants to request a hearing and a decision on their motion. (See *Meridian Financial Services, Inc.*, *supra*, 67 Cal.App.5th at p. 698 [" '[T]he fundamental nature of our adversarial system[ is that t]he parties must call the court's attention to issues they deem relevant. . . . " 'The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them.' " ' "].) Because appellants have not shown that Liolios was excused from complying with Both's subpoena for his financial records, the trial court correctly found Liolios was estopped from challenging the sufficiency of the evidence concerning his ability to pay the punitive damage

---

**16** Although appellants claim the trial was "later continued to May 24, 2022," the judgment indicates that trial actually commenced on May 25, 2022.

**17** (See *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at pp. 773–774 [holding that an appellant makes an implicit concession under such circumstances].)

**18** Appellants do not claim respondents filed an opposition to the motion to quash, and the case summary included in the appellants' appendix does not indicate that respondents filed such an opposition.

33

award.  (See *Corenbaum*, *supra*, 215 Cal.App.4th at pp. 1337–1338 [holding that a defendant who "fail[s] to comply with a subpoena requiring him to produce at trial records of his financial condition" "may be estopped from challenging a punitive damage award based on lack of evidence of financial condition"].)

Third, appellants argue, "At most, Liolios'[s] personal tax returns might identify his gross income and any deductions he took," such as "interest and business expense deductions . . . ." Because his "personal tax returns [supposedly] would not identify all of his liabilities or expenses," appellants submit that "the information [provided in Liolios's tax returns] would have been insufficient to show Liolios'[s] financial condition."  By failing to support their assertions regarding the potential contents of Liolios's tax returns with any citation to the record or judicially noticeable fact or material (e.g., Internal Revenue Service publications), appellants have forfeited their contention that "there is no causal link between Respondents' inability to get Liolios'[s] tax returns and their failure to show Liolios'[s] financial condition . . . ."  (See *United Grand Corp.*, *supra*, 36 Cal.App.5th at p. 161 [holding that an appellant forfeits a claim of error if it fails to support the argument with a record citation]; *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 ["[W]e are unable to accept counsel's argument on appeal as facts."].)

Lastly, appellants' resort to Civil Code section 3295, subdivision (c) is unavailing.[19]  Appellants contend this provision

---

[19]  Civil Code section 3295, subdivision (c) provides in pertinent part:  "No pretrial discovery by the plaintiff shall be permitted with respect to the evidence referred to in paragraphs

barred Both from discovering Liolios's financial condition because the subpoena was served on Liolios before the jury had found him liable for punitive damages at the conclusion of phase I of the trial. Respondents assert that discovery of Liolios's tax returns was not barred by Civil Code section 3295, subdivision (c) because the documents were "relevant to Both's compensatory damages, as he was claiming unpaid shareholder distributions . . . ." Indeed, in counsel's declaration supporting Both's trial subpoena, the attorney attested the documents sought "show how much in compensation . . . Liolios recieved [*sic*] such that . . . Both's 20 percent distributions of those amounts can be calculated," "[t]hese documents are the only way that . . . Both can determine how much money was paid to . . . Liolios for . . . warrants, stock options, and stock, 20% of which belong to . . . Both," and "Liolios was asked about these amounts both in

_____

(1) and (2) of subdivision (a) [(e.g., evidence of defendant's financial condition)] unless the court enters an order permitting such discovery pursuant to this subdivision. However, the plaintiff may subpoena documents or witnesses to be available at the trial for the purpose of establishing . . . financial condition . . . and the defendant may be required to identify documents in the defendant's possession which are relevant and admissible for that purpose and the witnesses employed by or related to the defendant who would be most competent to testify to those facts. Upon motion by the plaintiff supported by appropriate affidavits[,] . . . the court may at any time enter an order permitting the discovery otherwise prohibited by this subdivision if the court finds . . . that the plaintiff has established that there is a substantial probability that the plaintiff will prevail on the claim pursuant to Section 3294." (See Civ. Code, § 3295, subds. (a)(2) & (c); see also *id.*, § 3294, subd. (a) [indicating this statute governs recovery of punitive damages].)

deposition and via interrogatories and he was either unable and/or unwilling to provide the responsive information." Appellants do not contest counsel's representations regarding the materiality of this evidence to Both's recovery of unpaid distributions.

Based on counsel's uncontested declaration supporting the subpoena, we conclude that Civil Code section 3295, subdivision (c) did not prevent Both from obtaining Liolios's tax returns. (See *Rawnsley v. Superior Court* (1986) 183 Cal.App.3d 86, 91 [observing that Civ. Code, § 3295's "safeguards were designed to protect the defendant from a specific type of discovery abuse: a situation in which the plaintiff puts forth an easily alleged cause of action for punitive damages, thus requiring a defendant to expend the time and money 'necessary to the compilation of a complex mass of information *unrelated to the substantive claim involved in the lawsuit and relevant only to the subject matter of a measure of damages which may never be awarded*' "]; Edmon & Karnow, Cal. Prac. Guide: Civil Procedure Before Trial (The Rutter Group 2024) Discovery, ¶ 8:339.12 ["Civ.C. § 3295(c) does not bar pretrial discovery where defendant's finances are *directly related to the substantive claim involved.*"].) The tax returns would also have been admissible to demonstrate Liolios's ability to pay punitive damages after the jury had found him liable for punitive damages. (See Civ. Code, § 3295, subd. (d) [indicating the statute does not bar the admission of "[e]vidence of profit and financial condition . . . as to the defendant or defendants found to be liable to the plaintiff and to be guilty of malice, oppression, or fraud"]; Factual & Procedural Background, *ante* [noting that the amount of punitive damages was tried in phase II following the jury's award of

36

actual damages to Both and its determination that Liolios was guilty of malice, oppression, or fraud warranting imposition of punitive damages].)

In sum, appellants have not shown the trial court erred in ruling that Liolios's failure to comply with the trial subpoena estopped him from contesting the evidentiary sufficiency of the punitive damages award.  We thus do not decide whether LGI's alleged failure to comply with an order requiring it to provide further responses to certain interrogatories also supported the trial court's estoppel ruling against Liolios.  (See *People v. Camacho* (2022) 14 Cal.5th 77, 123 [" '[I]f the [trial court's] ruling was correct on any ground, we affirm.' "].)

3.      *We reverse the $2 million punitive damages award against LGI as excessive*

"In reviewing punitive damages awards for excessiveness under California law, we apply a substantial evidence standard. [Citation.]  We reverse ' "as excessive only those judgments which the entire record, when viewed most favorably to the judgment, indicates were rendered as the result of passion and prejudice." ' [Citations.]" (*Doe v. Lee* (2022) 79 Cal.App.5th 612, 618 (*Lee*).) Three factors are relevant to a reviewing court's analysis of the excessiveness of an award:  (1) "the reprehensibility of a defendant's actions"; (2) "the relationship between the amount of compensatory and punitive damages"; and (3) " 'the wealth of the particular defendant[.]' "  (See *id.* at pp. 618–619.)  Regarding the third factor, "a punitive damages award 'must bear some reasonable relationship to the net worth of the defendant, and where the award is grossly disproportionate to the defendant's wealth, a presumption arises that it was the result of passion and prejudice.' [Citation.]" (*Id.* at p. 619.)  "We are allowed to

consider the reasonableness of the award on the basis of its excessiveness alone: '[e]ven if an award is entirely reasonable in light of the other two factors[,] . . . the award can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone*.' [Citations.]"[20] (*Lee*, at p. 619.)

The parties agree Both's expert witness estimated that the value of LGI's equity was $2,812,047.[21] Appellants seem to argue this figure should be deemed LGI's gross—rather than net— value because they claim it does "not account for the award of compensatory and statutory damages against LGI." We do not resolve that question because even if the $2,812,047 figure were LGI's *net* value, the $2 million award of punitive damages against it would still be excessive.

Appellate courts have reversed as excessive punitive damage awards amounting to between 15 percent and 33 percent of a defendant's net worth, given that the purpose of punitive

---

**20** For that reason, we do not address respondents' arguments concerning the first two factors.

**21** Admittedly, respondents assert, "The value of LGI was *conservatively* estimated at $2,812,047." (Italics added.) The only support respondents provide for this proposition is a citation to 19 pages of accounting schedules prepared by Both's expert. Respondents do not explain why these 19 pages establish that $2,812,047 is a mere *conservative* estimate of LGI's value or identify a more appropriate figure to use for our analysis. (See *Inyo Citizens for Better Planning v. Inyo County Bd. of Supervisors* (2009) 180 Cal.App.4th 1, 14 (*Inyo Citizens for Better Planning*) [" 'We are not required to search the record to ascertain whether it contains support for [a party's] contentions.' [Citation.] We do not serve as 'backup appellate counsel,' or make the parties' arguments for them."].)

damages " 'is to deter, not destroy' " a defendant financially. (See *Lee*, *supra*, 79 Cal.App.5th at pp. 619, 623 [discussing appellate decisions reversing punitive damage awards].) Here, appellants correctly contend the award of punitive damages "represents over 71%" of the value Both's expert had assigned to LGI's equity. If an award of 33 percent of a defendant's net worth is considered excessive, an award of more than double that percentage is, a fortiori, excessive.

Respondents raise two counterarguments, neither of which is persuasive.

First, respondents argue, "LGI is estopped from making this argument" because "appellants interfered with Both's assessing their financial condition." (Boldface & some capitalization omitted from second quotation.) Yet, respondents do not contend appellants' purported efforts to conceal LGI's financial condition render unreliable the $2,812,047 estimate by Both's expert witness. (See also fn. 21, *ante* [noting that respondents fail to explain why they believe Both's expert's valuation of LGI was "conservative"].) Because respondents do not explain why LGI should nonetheless be estopped from contesting the excessiveness of the punitive damages award, we do not address this issue further. (See *Inyo Citizens for Better Planning*, *supra*, 180 Cal.App.4th at p. 14 [holding that a reviewing court does not function as backup appellate counsel].)

Second, respondents argue, "Liolios and LGI are alter egos" such that "LGI via Liolios has the ability to pay the full award." There is nothing in the trial court's ruling rejecting appellants' challenges to the punitive damages award to indicate the court made any finding as to whether LGI was Liolios's alter ego. Notwithstanding the absence of trial court findings on this point,

respondents assert, "There was substantial evidence showing LGI does not follow corporate formalities, Liolios dominates and controls LGI, and [Liolios] takes all of LGI's excess money in distributions just to himself." They further contend, "LGI is an S-Corp with Liolios taking all its assets." Because respondents fail to cite any authority or provide further analysis to support their alter ego contentions, we do not address them further. (See *Association for Los Angeles Deputy Sheriffs*, *supra*, 94 Cal.App.5th at p. 802 [noting that an appellate court is not "obligate[d to] . . . construct legal grounds in support of the judgment"].)

Next, we turn to the proper disposition for this error. Appellants assert, "If the punitive damages award is reversed, this court should strike the punitive damages award from the judgment" without instructing the trial court to hold a retrial on the amount of the award. In requesting this appellate relief, appellants acknowledge that "[r]etrial on the issue of punitive damages 'would be improper' " if it were " 'based *solely* on *insufficiency* of the evidence.' " (Italics added.) With regard to the punitive damage award against LGI, appellants disavow any intention to challenge the award "for lack of evidence." Rather, appellants state, "LGI's challenge to the punitive damages award is on the grounds it is disproportionate to LGI's value (and *not on the grounds of insufficient evidence of value*) . . . ."[22] (Italics

---

[22] In their reply brief, appellants vaguely argue for the first time that "Respondents failed to introduce sufficient evidence of *Appellants'* ability to pay . . . ." (Italics added.) Insofar as appellants are suggesting Both failed to introduce sufficient evidence of LGI's ability to pay punitive damages, they have forfeited that contention. (See *United Grand Corp.*, *supra*,

40

added.)  Accordingly, we reverse the award of $2 million against LGI only, and remand the matter to the trial court for a new trial on the amount of punitive damages against that defendant.  (See *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 952, 954 [indicating that upon reversing an excessive punitive damages award, the Court of Appeal may ordinarily remand the matter for a new trial on punitive damages].)

Lastly, appellants argue, "[T]he overwhelming and undisputed evidence demonstrates that *any* award of punitive damages would exceed LGI's ability to pay" because "the compensatory and statutory damages alone swallow LGI's entire net value."  Inasmuch as appellants intimate that a retrial on the amount of punitive damages would necessarily be futile, we disagree because we cannot say on the basis of the record before us that appellants' hypothesis is true.  After this case is remanded, the factfinder will determine the proper measure of punitive damages "based on evidence of [LGI's] financial condition *at the time of re-trial*."  (See *Washington v. Farlice* (1991) 1 Cal.App.4th 766, 777, italics added.)

## F.    We Affirm the Trial Court's Order Denying Appellants' Motion for Judgment Notwithstanding the Verdict

Appellants moved for judgment notwithstanding the verdict as to Both's (1) award of punitive damages and (2) recovery of unpaid wages.  We have reversed the judgment insofar as it awarded Both $2 million in punitive damages against LGI and remanded for a new trial on the amount of

---

36 Cal.App.5th at p. 161; *Golden Door Properties, LLC, supra*, 50 Cal.App.5th at pp. 482, 518.)

41

punitive damages to be awarded against that entity. (Discussion, part E.3, *ante*; Disposition, *post*.) Further, the trial court did not err in awarding punitive damages against Liolios. (Discussion, part E.2.) Finally, we have already rejected appellants' challenges to Both's recovery of unpaid wages. (Discussion, parts C–D, *ante*.) Consequently, appellants fail to show they are entitled to the relief sought by a motion for judgment notwithstanding the verdict, that is, a judgment in their favor, as opposed to reversal of portions of the judgment paired with a retrial of certain issues. (See *Group XIII Properties LP v. Stockman* (2022) 85 Cal.App.5th Supp. 1, 10 [indicating that this type of motion should be granted only if the movant is entitled to judgment "as a matter of law"].)

## DISPOSITION

We affirm the trial court's order denying appellants' motion for judgment notwithstanding the verdict.  We reverse the judgment insofar as it awarded respondent Ronald Andrew Both punitive damages of $2 million against appellant Liolios Group, Incorporated (LGI).  Upon remand, the trial court shall (1) retry the amount of punitive damages against LGI; and (2) conduct further proceedings consistent with this opinion.  We affirm the judgment in all other respects.  The parties shall bear their own costs on appeal.

NOT TO BE PUBLISHED.


BENDIX, J.


We concur:



ROTHSCHILD, P. J.



WEINGART, J.